## SHUPE *v.* STATE

[No. 216, September Term, 1964.]

*Decided April 7, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, SYBERT, OPPENHEIMER and BARNES, JJ.

*William Harris Zinman* for appellant.

*R. Randolph Victor, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Charles E. Moylan, Jr.* and *William A. Swisher, State's Attorney* and *Assistant State's Attorney,* respectively, *for Baltimore City* on the brief, for appellee.

SYBERT, J., delivered the opinion of the Court.

The appellant, William Frank Shupe, was convicted in a nonjury trial in the Criminal Court of Baltimore of the larceny of $316.67 and was sentenced to a term of 18 months in the House of Correction. The appellant entered this appeal after the sentence was suspended and he was placed on probation for 18 months and ordered to make restitution.

The evidence produced by the State showed that on the night of August 18, 1963, one Mosby was on duty at a large 24 hour gasoline station in Baltimore. At approximately 11 P.M. another employee, Jenkins, who is the brother-in-law of the appellant, came on duty to relieve Mosby. The appellant, Shupe, arrived at the station in his truck a few minutes later. Both Jenkins and Mosby testified that at about midnight Mosby gave Jenkins all the cash belonging to the station that he had on his person. Jenkins also testified that when he came on duty there was another employee by the name of "Charlie" (whose last name he could not recall) on duty besides Mosby and that Charlie handed him an unknown amount of money and left immediately. Mosby, however, testified that he was on duty alone when Jenkins arrived. Mosby said the amount turned over by him to Jenkins included all the cash receipts taken in by him and the cash given to him when he had come on duty earlier ("As near as I can remember, I think it was from a boy by the name of Buck Webb"). Neither Jenkins nor Mosby counted the money and neither knew how much money changed hands though Jenkins testified that he saw some tens and twenties.

They both testified that Shupe was just outside the open office door when Mosby gave Jenkins the money inside.

Jenkins then put the money into a cigar box which was kept in an unlocked storeroom in the rear part of the station. Access to the storeroom was possible only from a service or "lube" room which could be entered from the office or through large doors at the front. The door of the storeroom was on swinging hinges and was never locked. Mosby left the station a little after midnight. Jenkins testified that soon thereafter while he was taking care of some customers at the gas pumps out front he saw Shupe inside the station. His versions of the circumstances were substantially different on direct and cross examination. On direct examination, Jenkins said he saw Shupe come out of the storeroom into the lube room, walk out of the station, and get into his truck. He said Shupe "hollered" to him and said he would see him after awhile, and then drove away. He stated twice that he said nothing to Shupe at that time. On cross examination, however, he testified that he didn't see Shupe come out of the storeroom, but saw him in the lube room a few feet from the storeroom door, and coming from that direction. He said he asked Shupe what he was in there for, and that Shupe replied that he was looking over the place. He also said that Shupe bought some gasoline from him, while he was waiting on the other customers, and paid him with a ten dollar bill, also giving Jenkins one dollar which he owed him.

Jenkins testified that he was kept busy waiting on customers for from 20 to 30 minutes after Shupe had left. Then at about 1 A.M. he went into the storeroom and discovered that the money was gone. He reported the loss to the police. At around 2 A.M. Shupe returned to the station and Jenkins accused him of having stolen the money. Soon thereafter Shupe was arrested and denied that he had taken the money. Jenkins testified that Shupe had been drinking when he first visited the station on August 18, that he mentioned that he would "feel better" if he had more money, and he said that Shupe knew where the money was kept.

The owner of the station testified as to the amount of money that should have been in Jenkins' possession, or in the cigar box, at the time of the theft, and explained how he arrived at

the amount. He said that an accounting was made at the station in the regular course of business only once during a 24 hour period, usually in the morning. It was the procedure to read the meters on the several gasoline pumps, inventory other petroleum products, subtract credit sales, and then the resulting figure should equal the amount of cash receipts during the 24 hour period. There were five employees. The money during the 24 hour period would be kept on the person of the employee on duty or in the cigar box and would be passed from employee to employee without an accounting. It is not clear whether or not an exact record of charges for services was kept. Therefore, at any given time during a 24 hour period, except when the accounting was done, no one knew how much money was on hand or, in fact, how much should be on hand. The owner testified that each employee during the 24 hour period was responsible for any losses, and that in fact Jenkins was in the process of making restitution for this loss.

Shupe testified that he had visited the station to spend some time with his brother-in-law, Jenkins, as he had done several times previously. He denied that he had been drinking, but stated that when he found Jenkins busy he bought some gasoline, said he would come back, and drove away. He admitted that on a previous occasion Jenkins had shown him the cigar box containing the station receipts in the storeroom, but he denied the theft. He returned to the station at 2 A.M. The stolen money was not found on Shupe.

On this appeal Shupe raises several questions, but we find it necessary to deal with only one of them—whether the trial judge committed prejudicial error when he twice sustained objections by the State to questions asked of Jenkins on cross-examination by defense counsel. Both questions in effect asked Jenkins whether there had been any shortages of money at the station in the past. The questions were not answered, and we think the rulings unduly restricted the cross-examination to the prejudice of the appellant. Although the allowance or disallowance of certain questions on cross-examination is normally left to the sound discretion of the trial judge, *Wells v. State,* 236 Md. 381, 203 A. 2d 912 (1964) ; *Lloyd v. State,* 219 Md. 343, 149 A. 2d 369 (1959), cert. den. 359 U. S. 1014 (1959), in

cases where there is an abuse of discretion to the prejudice of a party we must reverse. *Plank v. Summers,* 205 Md. 598, 109 A. 2d 914 (1954). Cf. *Palacorolla v. State,* 232 Md. 435, 194 A. 2d 96 (1963).

The prevailing American rule relating to the scope of cross-examination, which is applicable in Maryland, was stated as follows in *Williams v. Graff,* 194 Md. 516, 522, 71 A. 2d 450 (1950):

"* * * where a witness is called to testify on a particular point, the adverse party in the cross-examination of the witness is restricted to the point on which he testified and cannot question him in regard to other issues in the case. Of course, a party may ask questions on cross-examination to show bias or prejudice in the witness, or to lay a foundation to admit evidence of prior contradictory statements. * * *

"However, our rule does not go to the extent of restricting the cross-examination of the witness to the specific details inquired into on direct examination, but permits full inquiry into the subject matter entered into. Where a general subject has been entered upon in the examination in chief, the cross-examining counsel may ask any relevant question on the general subject. * * *"

The extension of the rule, mentioned in the second paragraph just quoted, was applied in *Plank v. Summers, supra* (pp. 607-608 of 205 Md.). We think the questions posed in the instant case were permissible under it. The testimony of the State's witnesses, Jenkins, Mosby and the station owner, showed a loose, slipshod method of handling and protecting station receipts. Therefore, a question on cross-examination exploring the possible consequences of such methods was properly within the scope of the direct, and relevant to the case. Although defense counsel apparently did not know what the answers to the questions would be, "exploratory" type questions are well recognized, *McCormick, Evidence,* sec. 29, p. 55, and to prohibit their use under certain circumstances may be prejudicial, see *Alford v. United States,* 282 U. S. 687 (1931).

In the case before us if the witness had answered the questions in the affirmative the case of the defendant would obviously have been benefited, in view of the business techniques employed at the station and since the evidence against the appellant was purely circumstantial. The questions were relevant to the issues of whether there had been a theft and whether the appellant was the thief. Of course, the witness might have answered in the negative or disclaimed knowledge of any prior shortages, but the appellant had the right to ascertain whether the reply would be favorable or unfavorable to him. In any event the inquiry was relevant, and its exclusion prejudicial to the appellant.

> *Judgment reversed and case remanded for a new trial. Costs to be paid by the Mayor and City Council of Baltimore.*