RIDGEWAY SHOPPING CENTER, INC.
*v.* SEIDMAN

[No. 374, September Term, 1965.]

*Decided July 5, 1966.*

The cause was argued before Prescott, C. J., and Hammond, Marbury, Oppenheimer and Barnes, JJ.

*Benjamin Lipsitz* for appellant.

*Henry J. Frankel* for appellee.

Prescott, C. J., delivered the opinion of the Court.

Involved herein is a broker's commission in the amount of $2,375. Quite a number of contentions are attempted to be

raised, but, in the view that we take of the appeal, it may be determined by answering three simple questions: was the trial court clearly in error in finding that appellee was the procuring cause in the transaction involved; (2) if appellee were the procuring cause, was he entitled to his broker's commission; and (3), did the trial court err in refusing to permit certain cross-examination?

The Ridgeway Shopping Center, Inc. (Ridgeway) was a Maryland corporation, which owned a shopping center on Edmondson Avenue Extended in Baltimore County. Its stock was owned 25% by Samuel J. Dantoni (a lawyer and the corporation's president), 25% by Morgan L. Amaimo, and 50% by a Mr. and Mrs. Willing. The record does not disclose when the trouble arose, but in 1960 the corporation found itself in difficulty. Internal conflicts among the stockholders were shown to have existed, but whether it was also suffering financial difficulties is not made certain. In any event, its affairs were in litigation in the Circuit Court at Towson; at one time its affairs were conducted by a Receiver, and, at another, by a Special Master. The record makes it clear that Dantoni and Amaimo were opposing the Willings for control of the corporation.

Dantoni (apparently about the middle of 1960) had a plan whereby the corporation might solve its problems (and probably those of the stockholders) if it could secure a second mortgage of $100,000 on its property. Among others, Dantoni informed a Mr. Gahoff of his plan concerning the probability that Ridgeway would desire a second-mortgage loan. In Bickford's (apparently a lunch room), Gahoff introduced Dantoni to the appellee (a licensed real estate broker), who was having a cup of coffee. Seidman testified that Gahoff told Dantoni that "if you want to be successful in trying to get a loan, a mortgage loan, Mr. Seidman can help you if nobody else will be able to * * *."

After finishing the coffee, Seidman and Dantoni repaired to Dantoni's office (according to Seidman), where Dantoni told him that he (Dantoni) owned Ridgeway, without stating the exact portion, and explained to him about Dantoni's desire to obtain a $100,000 second mortgage for Ridgeway. He left the office with Dantoni's permission to attempt to secure the same.

Seidman approached Samuel J. Aaron and inquired if he would be interested in making the loan. Aaron was interested. Seidman arranged for a meeting between Aaron and Dantoni at Aaron's office. Seidman attended the meeting. After discussing the assets of Ridgeway and other matters with Dantoni, Aaron was willing to make the loan; however Dantoni was not then willing to proceed, telling Seidman that certain matters had to be straightened out in the court suit, but "after these things would be resolved he would let me arrange something else for him that he had in mind." (Dantoni claims that he thought Seidman was a principal, interested in making the loan himself. After this meeting, it should have been obvious to Dantoni, as it was to everyone else, that Seidman was not acting in the capacity of principal.)

After Dantoni turned down the second mortgage $100,000 loan, nothing of importance here happened between Seidman and Dantoni for several months. Then Dantoni called Seidman and said he had another plan (which will be set forth in some detail later), whereby he would need about $95,000 for a few minutes time, and for which he was willing to "give to the lender * * * the sum of $2,000." He requested Seidman to obtain the money for him.

Seidman again approached Aaron, who agreed to produce and did produce $95,000, which was utilized in the manner set forth below.

Seidman testified that Dantoni agreed to pay him a commission of 2½% if he obtained the loan, and, after the transaction was consummated, when he attempted to collect from Dantoni and Ridgeway, Dantoni told him funds were not then available, but to be patient and he would receive payment.

Mr. Aaron confirmed Seidman's versions of Aaron's transactions with Dantoni. With regard to the proposed mortgage loan, he stated, "well, Mr. Dantoni needed $100,000, and I agreed to give it to him. And the matter was brought to me by Mr. Seidman, I didn't know Mr. Dantoni before." And with regard to the $95,000 transaction, he said, "Mr. Seidman gave me the proposition and asked me about the proposition. I got it all through Mr. Seidman."

Dantoni took the stand and in substantial part corroborated

what Seidman and Aaron had said, but he denied that he ever employed Seidman as a broker to obtain the $100,000 second mortgage loan, or the $95,000 for the second transaction.

We now relate the details of the transaction wherein Aaron's $95,000 were used. Dantoni and Amaimo, with 50% of Ridgeway's stock, desired to obtain control. The only method of doing so was to obtain a part or all of the Willing stock. The corporation's activities were being administered by an officer of the court in Towson. Negotiations between Dantoni and Amaimo and the Willings resulted in the Willings' agreeing to accept $95,000 cash for their stock. This met with the approval of the Circuit Court. Dantoni and Amaimo arranged to sell a portion of the corporation's real estate and to refinance the indebtedness on its other assets, but before these matters could be consummated, they had to have $95,000 with which to obtain the Willing stock. This, according to Seidman's direct testimony (and fairly inferable from Aaron's) was when Dantoni again approached Seidman to see if he could procure the $95,-000. Seidman agreed to produce the same.

The mechanics of this transaction, the transfer of the Willing stock, the sale of a portion of Ridgeway's property, and the refinancing were effectuated as follows. A joint meeting was arranged at a title company. Aaron, Seidman, Dantoni, the Willings, representatives from the refinancing company, and, apparently a representative from the purchasing corporation attended. Aaron's part in the "play" was necessarily the opening "scene," for Dantoni and Amaimo had to have the Willing stock (or it had to be retired) before Ridgeway could function under the Dantoni-Amaimo control. Three letters were signed to be delivered simultaneously: one from Aaron to the Willings offering to purchase their stock for $95,000; one from the Willings to Aaron accepting his offer; and one from Aaron to Ridgeway offering to sell it the same stock for $97,000 ($2,000 was the amount agreed upon as payment to Aaron for producing the $95,000). Aaron produced a certified check covering the $95,000; the Willings were paid and turned over their stock, which was retired. Now Dantoni and Amaimo were in control. Ridgeway, presumably by executing the agreements to sell and to refinance, were able to pay Aaron his $97,000, and did so be-

fore the meeting was over. (The only reason given for "going through the motions" of having the Willings "sell" to Aaron and his immediate "resale" to them was that "the attorney representing the Willings did not want [Amaimo and Dantoni] to buy [the stock] for tax reasons that [he] felt important." Seemingly, the court, very shortly thereafter, released control over Ridgeway, which, of course, placed Dantoni and Amaimo in complete control.

## I and II

Upon this statement of facts, the appellant argues that the finding of the trial court that Seidman "was clearly the procuring agent for the transaction" was "clearly erroneous." Maryland Rule 886 a. It argues that the second mortgage negotiations were never consummated, and Seidman had nothing to do with the $95,000 transaction, which did not amount to a "loan" to Ridgeway, but was a plain and simple sale of stock to Aaron and a plain and simple resale thereof by him to Ridgeway. Seidman counters by stating that he, in fact, earned his commission when he first produced Aaron, who was ready, able, and willing to make the $100,000 second mortgage loan, but no such loan was made because Dantoni had changed his mind; but, whether or not he had earned the same at that time, he certainly was entitled to it with reference to the $95,000 transaction, whereby he procured Aaron to produce the money under an express verbal contract as to the amount of his commission.

We find it unnecessary to pass upon Seidman's first contention, for we think it is manifest that the evidence was sufficient to support the trial judge's finding that Seidman was the procuring cause of the $95,000 used in the second transaction, and his conclusion that, under the circumstances, Seidman was entitled to his commission as agreed upon by the parties. It is clear to us beyond any serious doubt that Aaron produced the $95,000 at the settlement so that Ridgeway (or Dantoni and Amaimo) could obtain the Willing stock, and he was prepared to utilize the funds in any legitimate manner necessary to effectuate that end, provided, of course, that he was protected in regard to repayment. Seidman, having procured the production of the $95,000 and its utilization (we make no intima-

tion as to what would have been the effect had Dantoni again changed his mind and refused to use the money), had earned his commission. The mode and manner of its utilization, so long as they were lawful and legitimate, are of little significance, and assuredly could not defeat Seidman's right to his commission. We hold that the evidence supports Judge Cullen's finding that Seidman was the procuring cause of the transaction and his conclusion that Seidman was entitled to his commission.

### III

This contention needs no elaborate discussion. During the course of the cross-examination of Seidman, he denied that he received any money from Aaron in connection with the proposed mortgage transaction. Counsel for Ridgeway then attempted to question him as to whether or not he had received any money from Aaron "for any reason" or in "connection with a broker's or real estate commission." Opposing counsel stated that he would not object if the inquiry were "limited to this [the mortgage] transaction"; whereupon counsel for Ridgeway did limit his inquiry and proceeded with the cross-examination.

Of course, cross-examination plays a most important part in the administration of justice in this country. It has been stated that it is one of the most efficacious tests for the discovery of the truth. *Regester v. Regester,* 104 Md. 1. And, when it relates to the facts in issue or to the issues themselves, it may, within reasonable limits, be pursued as a matter of right. 98 C.J.S., *Witnesses,* § 368. However, its scope, range, and extent are left largely in the sound discretion of the trial court. *Mezzanotte Const. Co. v. Gibons,* 219 Md. 178.

Here, the proposed cross-examination amounted to no more than an attempt to explore collateral matters upon the bare ground that it *might* elicit information that Seidman had been paid by Aaron for his services in regard to the proposed mortgage transaction, and therefore would not be able to collect also from Ridgeway. Surely Ridgeway was not entitled to pursue such cross-examination as a matter of right, and we can discover no abuse of discretion in the trial court's refusal to permit the questions.

Finding no error in the court's rulings, the judgment must and will be affirmed.

*Judgment affirmed; appellant to pay the costs.*