SHIELDS *v.* STATE OF MARYLAND

[No. 287, September Term, 1969.]

*Decided March 31, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Arthur Dale Leach,* with whom were *Paulson, Leach & Wilkinson* on the brief, for appellant.

*Francis X. Pugh, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *James E. Kenkel, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, Robert Edward Shields, and his attorney have made a valiant attempt to prevent his extradition to Ohio. He is charged there with having in his possession burglar's tools and having on six occasions forced entry into coin-receiving devices in telephone booths. The incidents in question it is said took place on October 1, 1968. The Governor of Maryland issued a warrant of rendition. Shields sued out the writ of habeas corpus testing the validity of his detention. After a hearing in the Circuit Court for Prince George's County, Judge Meloy remanded Shields to custody. We shall affirm the action of Judge Meloy.

Although he does not characterize them under these headings, the contentions of Shields may be set forth and summarized as follows: (1) Shields "proved beyond a reasonable doubt by overwhelming evidence" that he was not in the demanding state on October 1 but was in Maryland; (2) the evidence against Shields was insufficient since there was a conflict between the witnesses; (3) the trial court erred in refusing to permit Shields' witnesses to present impeachment testimony relative to prior inconsistent testimony given by a state's witness; (4) the trial court erred in refusing to permit Shields on cross-examination to ask the names of the eye witnesses of Shields' alleged presence in the State of Ohio on the critical date; (5) double jeopardy; and (6) that the fugitive warrant had expired by its terms.

## I.

Shields went to great lengths in an attempt to establish his presence in the State of Maryland at the time of the alleged crime, including testimony from the same attorney who represented him at the hearing before the Governor's representative, the habeas corpus hearing and in this Court. Although in other circumstances the evidence presented might be convincing, Shields cannot be said to have met the test which would entitle him to release because he was positively identified by two witnesses as the person they saw in two different telephone booths in Cleveland on the day in question.

Our latest pronouncement in this field is to be found in *Solomon v. Warden,* 256 Md. 297, 260 A. 2d 68 (1969), where Judge McWilliams said for the Court:

> "The issuance of a warrant of rendition by the Governor of the asylum state raises a presumption that the accused is the fugitive wanted and it is sufficient to justify his arrest, detention and delivery to the demanding state. *See, e.g., Johnson v. Warden,* 244 Md. 384, 388 (1966) ; *Koprivich v. Warden,* 234 Md. 465, 468-69 (1964), and the cases therein cited. In order to rebut the presumption the accused must prove *beyond a reasonable doubt* either that he was not present in the demanding state at the time of the alleged offense or that he was not the person named in the warrant, and upon proof of the one or the other he is entitled to be released. *Id.* Moreover, in this kind of habeas corpus proceeding '[t]he guilt or innocence of the accused may not be inquired into * * * except as it may be involved in identifying the person * * * charged with the crime.' Code, Art. 41, § 34 (1965 Repl. Vol.). It should be noted also that the presumption must be rebutted by 'overwhelming' evidence, *Mason v. Warden,* 203 Md. 659, 661 (1953), thus '[m]ere contradictory evi-

dence on the question of presence in or absence from the state demanding the accused is not sufficient * * *.' *Koprivich v. Warden, supra,* at 469." *Id.* at 300-301. (emphasis in original)

Cases in this state holding to the doctrine that mere contradictory evidence on the question of presence in or absence from the state demanding the accused is not sufficient are numerous and no useful purpose would be served in reviewing them. Perhaps one of the best examples is *State v. Murphy,* 202 Md. 650, 96 A. 2d 473, *cert. den.* 346 U. S. 824 (1953), where the accused contended that he had conclusively shown that he was in Maryland rather than in California (the demanding state) at the time of the commission of the alleged crime. The crimes were committed on November 30 and December 1, 1952. The accused produced eight witnesses to establish the fact that he was in Baltimore on November 29, November 30 and December 1. To establish his presence in California the state produced an eye witness. It also produced a handwriting expert who identified registration cards in California made at a relevant time. Judge (now Chief Judge) Hammond in the opinion for the Court in that case said:

"Judge Collins, in *State ex rel. Zack v. Kriss,* [195 Md. 559, 74 A. 2d 25 (1950)], summed up the authorities as follows, after saying that the evidence was merely contradictory as to whether the applicant was absent from the state: 'It is not the equivalent of an undisputed fact. This is not the proper proceeding to try the question of alibi. It has not been clearly and satisfactorily shown beyond a reasonable doubt, to overcome the otherwise controlling presumption, that the appellant is not a fugitive from Pennsylvania. The record here before us discloses "only a conflict of evidence". The evidence to overcome the presumption must be overwhelming.' We find that this language is fully applicable under the facts of the instant case." *Id.* at 654-55.

In *South Carolina v. Bailey*, 289 U. S. 412 (1933), the ratio was twelve witnesses who placed the accused in the demanding state at the time of the crime to twenty who placed him in the asylum state. The Supreme Court of North Carolina ordered the release of the petitioner. The Supreme Court of the United States reversed, saying:

> "Stated otherwise, he should not have been released unless it appeared beyond reasonable doubt that he was without the state of South Carolina when the alleged offense was committed and, consequently, could not be a fugitive from her justice.
>
> "The record discloses only a conflict of evidence; the requirement which we have indicated has not been met; and the challenged judgment must be reversed." *Id.* at 422.

The Court in that case also said at page 419, "The record presents an irreconcilable conflict of evidence. It is not possible to say with certainty where the truth lies."

The testimony adduced by Shields did not establish beyond a reasonable doubt that he was not in Ohio at the time of the occurrence of the alleged crime—and we cannot "say with certainty where the truth lies".

## II.

The attempt of Shields to have us determine the credibility of the witnesses by ruling that certain alleged inconsistencies in the evidence of the state's witnesses makes their testimony unworthy of belief is simply an effort to have us abrogate the longstanding rule that a mere conflict in testimony is not sufficient to warrant release of the accused. Suffice it to say, however, that no conflicts were presented which make the testimony so inherently improbable as to be unworthy of belief.

## III.

It is apparent that Shields, in his contention that the trial judge erred in not permitting him to present testi-

mony to impeach prior testimony of a state's witness, misunderstands the extradition process.

We have already quoted from *Solomon v. Warden, supra,* where Judge McWilliams referred to the presumption arising from the issuance of a warrant of rendition and to the fact that the guilt or innocence of the accused is not inquired into in this kind of habeas corpus proceeding.

The normal rules of evidence and procedure do not apply in an extradition hearing. *U. S. v. Flood,* 374 F. 2d 554, 558 (2nd Cir. 1967), citing *Johnson v. Warden,* 244 Md. 384, 389, 223 A. 2d 584 (1966). Frequently such hearings proceed on affidavits where the opportunity to confront, cross-examine and impeach obviously is not present.

In *Biddinger v. Commissioner of Police,* 245 U. S. 128 (1917), Mr. Justice Clarke gave a bit of the history of and the philosophy behind our extradition laws:

> "The provision of the Federal Constitution quoted [Art. IV, § 2], with the change of only two words, first appears in the Articles of Confederation of 1781, where it was used to describe and to continue in effect the practice of the New England Colonies with respect to the extradition of criminals. *Kentucky v. Dennison,* 24 How. 66. The language was not used to express the law of extradition as usually prevailing among independent nations but to provide a summary executive proceeding by the use of which the closely associated States of the Union could promptly aid one another in bringing to trial persons accused of crime by preventing their finding in one State an asylum against the processes of justice of another. *Lascelles v. Georgia,* 148 U. S. 537. Such a provision was necessary to prevent the very general requirement of the state constitutions that persons accused of crime shall be tried in the county or district in which the crime shall have been com-

mitted from becoming a shield for the guilty rather than a defense for the innocent, which it was intended to be. Its design was and is, in effect, to eliminate, for this purpose, the boundaries of States, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land.

"Such being the origin and purpose of these provisions of the Constitution and statutes, they have not been construed narrowly and technically by the courts as if they were penal laws, but liberally to effect their important purpose, with the result that one who leaves the demanding State before prosecution is anticipated or begun, or without knowledge on his part that he has violated any law, or who, having committed a crime in one State, returns to his home in another, is nevertheless decided to be a fugitive from justice within their meaning. *Roberts v. Reilly*, 116 U. S. 80; *Appleyard v. Massachusetts*, 203 U. S. 222; *Kingsbury's Case*, 106 Massachusetts, 223.

"*Courts have been free to give this meaning to the Constitution and statutes because in delivering up an accused person to the authorities of a sister state they are not sending him for trial to an alien jurisdiction, with laws which our standards might condemn, but are simply returning him to be tried, still under the protection of the Federal Constitution but in the manner provided by the State against the laws of which it is charged that he has offended.*" *Id.* at 133. (emphasis added)

In *Charlton v. Kelly*, 229 U. S. 447 (1913), in a foreign extradition case, the Supreme Court of the United States said:

"[T]his is not a writ of error, and mere errors in the rejection of evidence are not subject to review by a writ of *habeas corpus*." *Id.* at 457.

Therefore, Judge Meloy was not in error in refusing to permit the impeaching testimony. Moreover, even if the witness had been successfully impeached there would have remained yet other evidence placing Shields in Ohio on the crucial date.

IV.

Shields gives no citation of authority for his proposition that the trial judge erred in not permitting him on cross-examination to go on a "fishing expedition" in the habeas corpus case by extracting from one of the witnesses the names of other alleged eyewitnesses in Ohio. The allowance or disallowance of certain questions on cross-examination is normally left to the sound discretion of the trial judge. *Ridgeway, Inc. v. Seidman,* 243 Md. 358, 364, 221 A. 2d 393 (1966) ; *Shupe v. State,* 238 Md. 307, 310, 208 A. 2d 590 (1965), and cases there cited. Opportunities for discovery, if permitted under the Ohio procedure, will come at a later date. It is obvious that a listing of all witnesses with their addresses or, alternatively, a statement that there were no eyewitnesses would change in no way the evidence already before the Governor's representative to the effect that Shields was in Ohio at the time of the commission of the alleged crime. There was no error.

V.

Two hearings were held before the Governor's representative. At the conclusion of the first hearing he requested more evidence. The evidence was produced. Shields contends that double jeopardy is applicable because of the holding at the first hearing that there was insufficient evidence. He is in error. The second hearing does not constitute double jeopardy.

In *Moquin v. State,* 216 Md. 524, 140 A. 2d 914 (1958), Judge Gray said for this Court:

"The doctrine of double jeopardy is one of ancient origin and is designed to prevent the prosecution of a person a second time when he has already been subjected to the risk of 'life and

limb' in a prior trial. The concept clearly contemplates that the action which bars a second prosecution must be one instituted in a court which has the power to convict and punish the person prosecuted for his criminal conduct. See 4 *Blackstone's Commentaries* 335. Lewis Edition at pp. 1725-26." *Id.* at 527-28.

*Cf. Couser v. State,* 256 Md. 393, 260 A. 2d 334 (1970) and *Gray v. State,* 254 Md. 385, 255 A. 2d 5 (1969).

In *Collins v. Loisel,* 262 U. S. 426 (1923), a case involving foreign extradition, Mr. Justice Brandeis said for the Court:

"Collins contended that commitment on the new affidavits, after discharge in proceeding based on others identical in form and substance, was a violation of the Fifth Amendment * * *. The constitutional provision against double jeopardy can have no application unless a prisoner has, theretofore, been placed on trial. (citing authorities) The preliminary examination of one arrested on suspicion of a crime is not a trial; and his discharge by the magistrate upon such examination is not an acquittal. (citing authorities) Even the finding of an indictment, followed by arraignment, pleading thereto, repeated continuances, and eventually dismissal at the instance of the prosecuting officer on the ground that there was not sufficient evidence to hold the accused, was held, in *Bassing v. Cady,* 208 U. S. 386, 391, not to constitute jeopardy." *Id.* at 429.

In *Bassing v. Cady,* 208 U. S. 386 (1908), to which reference was made by Mr. Justice Brandeis, a warrant had been issued by the Governor of Rhode Island. The accused was returned to New York. The indictment was dismissed by the prosecutor because he had insufficient evidence. A new indictment was returned and Rhode Island was again requested to deliver up the accused. He

fought this on the ground of double jeopardy. Mr. Justice Harlan said for the Court:

> "Suffice it to say, that when the second warrant of arrest was issued by the Governor of Rhode Island the accused had not been tried, nor put on final trial, in New York, nor placed in jeopardy there for the offense with which he was charged in that State. We do not, therefore, perceive any reason, based on the Constitution and laws of the United States, why the Governor of Rhode Island could not honor, as he did, the second requisition of the Governor of New York, and issue thereon a second warrant of arrest. It is certain that no right secured to the alleged fugitive by the Constitution or laws of the United States was thereby violated." *Id.* at 392.

See also *Morse v. U. S.,* 267 U. S. 80 (1925).

Under the authorities, therefore, double jeopardy is not applicable.

## VI.

It is the claim of Shields that the maximum limit of time a person may be held on a fugitive warrant is 90 days, that the state continued the warrant for six months and then *nolle prosed* it on April 21, 1969, that there was no fugitive warrant in effect when the Governor's warrant was issued on May 27 and, therefore, Shields must be released. Whether a second fugitive warrant was issued does not appear. There would have been nothing to prevent such issuance. The answer to this contention on the part of Shields is to be found in *Willin v. Sheriff,* 201 Md. 667, 669, 95 A. 2d 87 (1953), where Judge (later Chief Judge) Henderson said, "The matter to be tested is not the legality of a previous arrest, but the legality of the arrest under the warrant of rendition." It would appear that Shields has lost sight of this fact. *Cf. Cohen v. Warden,* 252 F. Supp. 666 (D. Md. 1966). A case exactly in point is *People ex rel. Gummow v. Larson,* 35 Ill. 2d 280, 220 N.E.2d 165 (1966). Gummow had been ar-

rested pursuant to a fugitive warrant. He was released on bail. More than 90 days later, he was arrested pursuant to a rendition warrant issued by the Governor. He argued that since more than 90 days had elapsed between the date of his admission to bail and the date of his subsequent arrest, the spirit of the Uniform Act as manifested by the 90 day limitation required his discharge from custody. The court said:

> "The purpose of these sections of the extradition law is to prevent unreasonably lengthy periods of confinement of fugitives pending consummation of extradition proceedings by the demanding state. (*Cf. Lott v. Heyd,* (5th cir.), 315 F. 2d 350; *Bolton v. Timmerman,* 233 S. C. 429, 105 S.E.2d 518.) There is, however, no indication of any legislative intent to restrict the period within which the Governor of Illinois may issue his rendition warrant to the period within which the court which issues the fugitive warrant may commit the accused or require him to give bond.
>
> "A quite similar situation was before the court in *Lombardo v. Tozer,* 264 S.W.2d 376 (Mo. St. Louis Ct. App.) where the court held the legality or illegality of the fugitive warrant proceedings was moot since that warrant became *functus officio* upon issuance and service of the rendition warrant. (See also *Lott v. Heyd,* (5th cir.) 315 F. 2d 350.) We agree * * *." *Id.* at 282.

See also *Bursque v. Moore,* 26 Conn. Sup. 469, 227 A. 2d 255 (1966).

There being no error, the order must be affirmed.

*Order affirmed, with costs.*