PETER T. STATHES *v.* STATE OF MARYLAND

[No. 237, September Term, 1975.]

*Decided December 30, 1975.*

476

The cause was argued before MENCHINE, LOWE and MELVIN, JJ.

*Joseph B. Simpson, Jr.,* with whom were *Vivian V. Simpson, John Noble, Stephen P. Johnson* and *Simpson & Simpson* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County, Darrel L. Longest, Deputy State's Attorney for Montgomery County,* and *Louis S. Lear, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

On July 17, 1974 Peter T. Stathes, a former president of Montgomery Federal Savings and Loan Association, was indicted by the Grand Jury of Montgomery County on two counts of fraudulent misappropriation as a fiduciary in violation of Maryland Code Article 27, § 132. Brought to trial before a jury in the Circuit Court for Montgomery County

(Shure, J. presiding) Stathes was found guilty under the first count that reads as follows:

*"Fraudulent Misappropriation by Fiduciary*

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that Peter T. Stathes, late of said County, beginning on or about April 6, 1967 until on or about July 20, 1973, at the County aforesaid, did unlawfully, while acting in the capacity of a trustee and fiduciary, embezzle and fraudulently and wilfully appropriate to a use and purpose not in the due and lawful execution of his trust for and on the behalf of The Montgomery Federal Savings and Loan Association, the sum of Fifty Thousand dollars ($50,000.00), current money, in violation of Article 27, Section 132 of the Annotated Code of Maryland, contrary to the form of the Act of Assembly in such case made and provided and against the peace, government and dignity of the State."

The count had been particularized as follows:

"Comes now the State of Maryland and provides the following Bill of Particulars surrounding the allegations of the Indictment filed herein:

"Count I: That beginning on or about April 27, 1967 until on or about July 20, 1973, the defendant, then in a position of trust and acting in a fiduciary relationship to the shareholders in The Montgomery Federal Savings and Loan Association, caused certain monies of said Association to be deposited in the Citizen's Bank and Trust Company of Maryland, pursuant to an agreement with Joel T. Kline. These monies were to remain in non-interest bearing accounts to act as compensating balances on loans made by the Citizen's Bank and Trust Company of Maryland to companies in which Joel T. Kline had an interest.

> The defendant agreed to this arrangement in return
> for certain favors and benefits rendered or to be
> rendered to the defendant by Joel T. Kline."

Stathes was sentenced conditionally to a term of three years imprisonment under the provisions of Code Article 27, § 641 A.

His appeal to this Court thus phrases the questions presented:

> "1. Was the Circuit Court without jurisdiction to try appellant, an officer and director of a federally chartered savings and loan association, upon an Indictment charging embezzlement in violation of Article 27, Section 132 of the Code?
>
> 2. Did the court below err in its instructions to the jury (a) by failing to instruct on the requisite fraudulent intent needed for conviction of a violation of Article 27, Section 132, and (b) by failing to instruct properly on the necessity for corroboration of the testimony of an accomplice?
>
> 3. Did the court below err by unduly restricting the cross-examination of two of the State's witnesses in violation of the appellant's constitutional right to confront the witnesses against him?
>
> 4. Was there sufficient evidence (a) to corroborate the testimony of an accomplice that appellant opened a checking account as a compensating balance for said accomplice, or (b) to show that appellant had the specific intent necessary to sustain a conviction under the statute?"

### 1. Jurisdiction

Appellant contends that Montgomery Federal Savings and Loan Association as a federally chartered savings and loan association is an "instrumentality and agency of the United States, not subject to state regulation or control." From that undisputed premise, he argues that State courts are without jurisdiction to prosecute him, contending that Congress has

provided a complete and pervasive scheme to regulate federal savings and loan associations under Title 12 — Banks and Banking, Ch. 12 — Federal Savings and Loan Associations, Section 1461, *et seq.* and has by 18 U.S.C.A. § 657 imposed criminal penalties upon officers of such associations for embezzlement.[1] Otherwise stated, appellant contends that Congress has placed such criminal conduct within the exclusive jurisdiction of the federal courts.

Appellant's principal reliance is upon the cases of *Easton v. Iowa,* 188 U. S. 220, 23 S. Ct. 288, 47 L. Ed. 452 (1903); and two State decisions, namely: *Martin v. State,* 61 S.W.2d 999 (C.C. App. Tex., 1933); and *State v. Thornton,* 214 N. W. 279 (Minn., 1927). We find *Easton, supra,* to be readily distinguishable. In *Easton,* the Iowa statute consisted of two sections that: (a) prohibited *every* bank "when insolvent, [to] accept or receive [any] deposit," and (b) imposed criminal liability upon "any owner, officer, director, cashier, manager, member, or person knowing of such insolvency who shall knowingly receive or accept * * * any such deposits * * *." In reversing state conviction in *Easton,* the Supreme Court said at 231-32, [291], [457]:

> "But we are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.
>
> "Nor can we concede that by such legislation of a state as was attempted in this instance, the affairs of a national bank, or the security of its creditors,

---

1. We note that the provisions of Title 18 U.S.C.A. § 3231 provide:

"The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

would be advantageously affected. The provision of the state statute is express that it is the duty of the officers of the bank, when they know it is insolvent, to at once suspend its active operations; for it is obvious that to refuse to accept deposits would be equivalent to a cessation of business. Whether a bank is or is not actually insolvent may be, often, a question hard to answer. There may be good reason to believe that, though temporarily embarrassed, the bank's affairs may take a fortunate turn. Some of the assets that cannot at once be converted into money may be of a character to justify the expectation that, if actual and open insolvency be avoided, they may be ultimately collectible, and thus the ruin of the bank and its creditors be prevented. *McDonald v. Chemical Nat. Bank*, 174 U. S. 610, 43 L. Ed. 1106, 19 Sup. Ct. Rep. 787. But, under the state statute, no such conservative action can be followed by the officers of the bank except at the risk of the penalties of fine and imprisonment. In such a case the provisions of the Federal statute would permit the Comptroller to withhold closing the bank, and to give an opportunity to escape final insolvency. It would seem that such an exercise of discretion on the part of the Comptroller would, in many cases, be better for all concerned than the unyielding course of action prescribed by the state law. However, it is not our province to vindicate the policy of the Federal statute, but to declare that it cannot be overridden by the policy of the state."

In *Martin, supra,* as in *Easton,* the statute in question had attempted to extend the effect of a state law set up to control banking institutions so as to have application to national banks. The case therefore factually is parallel to *Easton* and similarly distinguishable.

In *Thornton, supra,* the Supreme Court of Minnesota made special note that the State indictment "appears to be drawn with painstaking care to state an offense under section 5209, Rev. St. of the United States" (p. 280). There is

nothing in the opinion to indicate that the offense charged was in violation of any Minnesota statute. There is little wonder that, under such circumstances, the Court said (p. 279) "* * * any offense against the [Federal] statute cited is within the exclusive jurisdiction of the federal courts."

We do not interpret the decision in *Easton* as pre-empting State prosecution or compelling exclusive Federal jurisdiction in the prosecution of general criminal offenses proscribed by both Federal and State statutes. We do not regard the subject statute as constituting in any sense an attempt by the State to override the policy of a federal statute. On the contrary, we regard this State penal statute, applicable to all persons within its borders, to have no relationship to an attempt to assert control of federally chartered associations. It merely provides for the punishment of an act that is criminal under the laws of both State and Federal Governments. The right of different sovereignties to prosecute in such circumstances is well recognized. *Westfall v. U. S.*, 274 U. S. 256, 47 S. Ct. 629, 71 L. Ed. 1036 (1927); *U. S. v. Lanza*, 260 U. S. 377, 382, 43 S. Ct. 141, 142, 67 L. Ed. 314, 317 (1922); *U. S. v. Jackson*, 470 F. 2d 684 (5th Cir., 1972). In *U. S. v. Jackson, supra,* the Court clearly and succinctly stated the rule we apply to the subject case when it said at 689:

"An act denounced as a crime by both federal and state sovereignties is an offense against the peace and dignity of both, and may be punished by each."

## 2. Instructions

### (a) Alleged failure to instruct as to fraudulent intent

Appellant contends that it was essential that the jury be sufficiently instructed as to the required specific statutory intent and argues that the charge of the court failed to do so. We do not see it that way.

It is an undisputed fact that the appellant was president of Montgomery Federal Savings and Loan Association. As such he stood in a fiduciary relationship to the corporation

and thus would not be permitted under any circumstances to use the powers entrusted to him to promote his personal interests at the expense of the corporation. *Coffman v. Maryland Publishing Co.*, 167 Md. 275, 289, 173 A. 248, 254 (1934).

The charge of the court must be considered in the light of this circumstance. The charge of the court included, *inter alia*, the following:

> "Now, we are here dealing with criminal breach of fiduciary duty, specific violations of Article 27, Section 132 of the Annotated Code of Maryland. This section deals with crimes and punishments, and I have had a photocopy made of this section which the foreman can take into the jury room with you for your deliberation.[2]* * * He is charged with a violation of this fiduciary duty, and it is, therefore, for you to determine whether he is or is not guilty, guilty being necessary beyond any reasonable doubt, as I have previously indicated. * * *

> "The Defendant contends that he did not embezzle or in any way misuse the funds of the shareholders and that the deposits made in the banks in question were approved by the Board of Directors and were for legitimate business purposes only; such as, creating goodwill, solicitation of new accounts and ordinary business operations wherein checking accounts were necessary. The Defendant was acting in a fiduciary

---

[2.] Article 27, § 132 reads as follows:

"§ 132. *Fraudulent misappropriation by fiduciaries.*

If any executor, administrator, guardian, committee, trustee, receiver or any other fiduciary shall fraudulently and wilfully appropriate to any use and purpose not in the due and lawful execution of his trust, any money or any other thing of value which may come into his hands as such executor, administrator, guardian, committee, trustee, receiver, or in any other fiduciary capacity, or secrete it with a fraudulent intent to appropriate it to such use or purpose, he shall be deemed guilty of embezzlement, and shall be punished upon conviction by imprisonment in the penitentiary for not less than one year nor more than five years."

capacity as President and Director, and it is for you to determine whether or not he had, first, the ability to control; and secondly, did so control and arrange for the use of funds or compensating balances or otherwise as favors in exchange for favors from Mr. Kline and his associates. If he did use the savings and loan association funds in this manner this constitutes criminal intent and your verdict must be guilty. If you do not so find, your verdict must be not guilty."

We note that the full text of the criminal statute had been given to the jury by the trial judge. This action caused its language to be incorporated in the charge by reference. This tended to insure that the jury was fully advised that proof of a specific fraudulent intent was an element of the State's burden. In *Andresen v. State,* 24 Md. App. 128, 331 A. 2d 78 (1975), we said at 191-92 [116]:

> *"Elements of Fraudulent Misappropriation by a Fiduciary*
>
> The appellant now claims that he objected to the failure of the trial court to define the elements of the crime of fraudulent misappropriation by a fiduciary, although he admits that his objection was 'inartfully worded.' That is the most artful of understatements, since the confrontation consisted only of the following:
>
>> 'THE COURT: ... As far as the other objections are concerned, there are certain instructions that I gave the jury that have not come from case law, necessarily, Maryland case law, but in order to apprise the jury of the requirements under the various counts, I think it is necessary to explain to them the elements of the crime that needed to be proven, and sometimes you can't find that particular element defined; therefore you've got to go elsewhere.

'MR. LAMB: I would submit that that would be where the judge is the determiner of the law, but in Maryland the jury is the finder of facts.'

We cannot glean the remotest 'inartful' suggestion of the objection now being pressed. The judge had, moreover, read to the jury the full text of Article 27, § 132."

We believe that the overall charge of the trial court fairly and adequately instructed the jury that the State was required to show a specific intent or special *mens rea* of fraud and wilfulness. This is all that was required. *Gordon v. State,* 14 Md. App. 245, 258-59, 286 A. 2d 833, 842 (1972).

### (b) *Failing to instruct properly on the necessity for corroboration of an accomplice*

The record shows that the appellant did not seek an instruction on the necessity for corroboration of the testimony of an accomplice. The issue is not before us. Rule 756 g.

In *Brown v. State,* 14 Md. App. 415, 422, 287 A. 2d 62, 65 (1972) we said:

"* * * we think that as a general guide, we may say that under Rule 756 g we will take cognizance of and correct an irremediable error of commission, but not an error of omission. Of course, the error must be plain, and material to the rights of the accused, and, even then, the exercise of our discretion to correct it should be limited to those cases in which correction is necessary to serve the ends of fundamental fairness and substantial justice.

"The omission here was one which the trial court could have, and undoubtedly would have, supplied by a supplementary instruction if appellant had requested it before the jury retired to consider its verdict."

That rule is particularly apposite in the subject case. The sole objection to the trial court's charge relating to the testimony of an accomplice had been as follows:

"We object on the grounds of omission from the charge to the Court omitting to give the jury our instruction or charge relating to the great care with which the jury must view the testimony of accomplices."

The trial court had included in its charge the following:

"As you will recall, the State has presented certain alleged accomplices in connection with the use of funds claimed to be for compensating balances. One of the witnesses, Mr. Kline, has been granted immunity from prosecution in exchange for his testimony in this case. This is proper for the prosecution to do, and this is a recognized use in the means of law enforcement. This testimony, however, must be weighed carefully, along with all of the other testimony, and you give it such weight as in your judgment it is fairly entitled to receive."

The record fails to include the instruction that had been sought by the appellant. In its absence, the exception indicates merely that the appellant requested that the jury be alerted to the need for careful examination of the testimony of an accomplice. The charge as given adequately did so. We do not intimate, of course, that the uncorroborated testimony of an accomplice would serve as legally sufficient evidence to convict.

### 3. Restrictions on Cross-Examination

Appellant contends that cross-examination was wrongfully curtailed to the point where appellant's constitutional right to confrontation was denied.

### (a) The witness Kline

Extensive cross-examination was permitted with respect

to Kline's character as the following excerpts from the record will demonstrate:

"Q And did you from time to time offer money or things of value in connection with appointments to federal office?

A Yes, sir.

Q And did you from time to time offer money and things of value in connection with an appointment to State office?

A Yes, sir.

Q And did you from time to time in connection with appointments to State, Federal or County offices offer substantial sums of money?

A Yes, sir.

Q And did this conduct extend over a period of time?

A Yes, sir.

Q And did this extend to the law enforcement officials?

A Yes, sir.

Q And did this extend to the offices of the Executive Department of the Federal Government?

A Yes, sir.

Q And did this extend to the Banking and Insurance Department within the State of Maryland?

A Yes, sir.

Q And did you at one time discuss with persons, with people the offering of money or things of value so that you, yourself, might hold the office of Banking Commissioner of the State of Maryland?

A Yes, sir.

* * *

Q And did you have similar discussions with other persons in the State of Maryland regarding the offering of money or things of value so that other people might get other appointments?

A Yes, sir.

Q And did this cover Executive offices, that is, offices of the Executive Branch of the Government of the State of Maryland?

A Yes, sir.

Q And that is other than the Banking Commissioner?

A Yes, sir."

It had been elicited from Kline in his direct examination that he had pleaded guilty to conspiracy to obstruct justice in that in 1972 "[he] and others were telling the witnesses how to testify and were obstructing justice * * *." The record also showed the following:

"THE WITNESS: There is an agreement that was entered into between myself and the State of Maryland with a promise not to prosecute me for any criminal activity in return for my cooperation in future criminal prosecution, with the understanding that if I should perjure myself or not be candid this agreement, I believe, will become null and void and I could be prosecuted, and anything I said could be used against me."

Such was the setting when a sustained objection by the State prevented counsel for appellant from showing the specifics of Kline's conduct and from obtaining the names of the other persons allegedly involved. The State's Attorney

had objected to such an inquiry because the proposed
evidence was not relevant to the trial of the case; was not
proper impeachment; and might have a substantial
deterrent effect upon pending federal investigations.

In the course of the discussion upon impeachment of a
witness by cross-examination to show bad character as
evidenced by conduct, it is said in 3A Wigmore, *Evidence*, §
983 (Chadbourn rev. 1970) at 847:

> "(2) By the rule obtaining in most jurisdictions of
> the United States, the repression of possible abuses
> is left in the *discretion of the trial judge;* questions
> upon facts relevant to character may still be
> forbidden by him where he believes that under the
> circumstances it is unnecessary and undesirable."

The following quotation from *Kruszewski v. Holz,* 265 Md.
434, 440, 290 A. 2d 534, 538 (1972), not only demonstrates
that Maryland adheres to that general rule, but the language
of the Court tends as well to demonstrate that the sustaining
of the objection in the subject case did not constitute an
abuse of discretion:

> "It is well settled law in this State that exploratory
> questions on cross-examination are proper when
> they are designed to affect a witness' credibility,
> test his memory or exhibit bias. *Shupe v. State,* 238
> Md. 307, 311, 208 A. 2d 590 (1965); *Kantor v. Ash,*
> 215 Md. 285, 290, 137 A. 2d 661 (1958); *Ager v.
> Baltimore Transit Co.,* 213 Md. 414, 427-28, 132 A.
> 2d 469 (1957). But it is recognized that the scope,
> range and extent of such interrogation rests in the
> sound discretion of the trial court. *Shields v. State,*
> 257 Md. 384, 392, 263 A. 2d 565 (1970); *Ridgeway,
> Inc. v. Seidman,* 243 Md. 358, 364, 221 A. 2d 393
> (1966); *Mezzanotte Const. Co. v. Gibons,* 219 Md.
> 178, 181, 148 A. 2d 399 (1959). Here, it was
> unnecessary for Dr. Thomas to be further
> questioned in order to demonstrate his prejudice in
> favor of appellee. The jury was already cognizant of
> a possible bias since it had been shown that the two

> physicians were colleagues who had collaborated in
> the treatment of Mrs. Kruszewski."

Similarly, in the subject case, the witness had acknowledged participation in bribery attempts against public officials and had admitted attempts to thwart justice by bearing false witness. Specifics of the offenses would neither have further blemished his escutcheon a whit, nor would the disclosure of the names of his associates have shown that he was either a lesser or a greater scoundrel. A contrary ruling, on the other hand, would have served to permit the witness stand to become the "slaughter house of reputations" of others. *See*: Wigmore, *supra*, p. 841.

We find neither abuse of discretion nor constitutional denial of confrontation in the ruling of the court.

### (b) *The Witness Amick*

In the course of the direct examination of the witness John R. Amick, an Assistant Chief Examiner of the Federal Home Loan Bank Board, the State attempted to have the Bank Board's examination records of Montgomery produced for introduction into evidence. The witness explained that he was forbidden to disclose examination reports in the absence of authority to do so. The State thereupon desisted from its effort to obtain the documents and limited its subsequent examination to an inquiry — without objection — to strictly hypothetical situations. This inquiry sought to determine what the witness as an examiner would do if he discovered that association funds had been placed in inactive, non-interest bearing checking accounts. The witness responded that: "We would confer with management and ask him why those accounts were not in something other than a non-interest bearing checking account, or at least bring his attention to it."

Defense counsel on cross-examination also sought unsuccessfully to obtain the examination reports and to elicit from the witness testimony as to their contents. Defense counsel requested the court to order the witness to produce the documents. The trial judge refused, saying:

490

"Now let me remind counsel that this case has been set for sometime, and Mr. Burgess and Mr. Mann have been attorneys for this defendant for many months, and they have the same right of subpoena, and interrogation, deposition, interrogatories. As a matter of fact more rights than the State has."

The trial judge also said:

"And this member of the court has not, I am not familiar with any other member of the court that has been even asked to consider this question before this morning."

After further colloquy between court and counsel, the following inquiry was directed to the witness:

| "THE COURT: | Mr. Amick, in this briefcase that is on the front table with a lock as I notice it, what is in that briefcase that is not available to the defense? |
|---|---|
| THE WITNESS: | All of the records wouldn't be available to the defense. |
| THE COURT: | All of them would be available? |
| THE WITNESS: | All wouldn't be. |
| THE COURT: | All would not be? |
| THE WITNESS: | That's right. |
| THE COURT: | Nothing in that suitcase would be available to them? |
| THE WITNESS: | That's right. |
| THE COURT: | Has this information been available to the State that is in that suitcase? |
| THE WITNESS: | No. All that information wasn't made available to the State. |
| THE COURT: | Well, are there some things in there that were made |

|               |                                                                                                                                                                         |
|---------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|               | available to the State that you say are not available to the defense?                                                                                                    |
| THE WITNESS:  | The monthly reports were made available to the State, and the — the State looked at the Management Questionnaires.                                                       |
| THE COURT:    | The Management Questionnaires are in evidence. So there is no problem with those.                                                                                        |
| MR. BURGESS:  | Just two of them are.                                                                                                                                                    |
| MR. LONGEST:  | Let me make the record clear. Those are the only two that have been made available to the State. So let's don't leave the inference that we have something that we are hiding." |

In sum, the examination reports had been barred to both State and defense.

12 C.F.R. § 505.6 in pertinent part reads as follows:

"(a) *General rule.* Except as otherwise provided in this part or as may be specifically authorized by the Board,[3] information of the Board that has not been published in accordance with § 505.3 and is not available to the public through other sources will not be made available to the public or otherwise disclosed if such information:

\* \* \*

(2) Is contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of, the Board or a Federal

---

[3.] Federal Home Loan Bank Board.

Home Loan Bank, relating to the affairs of any member institution or affiliate thereof, or any other person engaged, or proposing to engage, in the savings and loan business; * * *"

Section 505.4 in pertinent part provides that:

"It is the policy of the Board to disclose its records to the public, even though such records may, in the Board's discretion, be exempted from disclosure by Section 552 of Title 5 of the United States Code or by § 505.6, wherever such disclosure can be made without resulting injury to a public or private interest intended to be protected by the foregoing statute * * *."

Section 505.7 may be summarized as authorizing issuance of subpoenas for the production of classified documents or information and for notification to the attorney for the party at whose instance the subpoena has been issued of the substance of the disclosure rules. Section 505.8 provides in substance that one aggrieved by denial of information or records may make written application to the general counsel of the Federal Home Loan Bank Board for their release. If refusal results from that application, a further appeal to the Board is provided by the section.

No effort had been made by appellant to utilize the provisions of law by which court use of confidential documents may be achieved. In the absence of proof of reasonable efforts to obtain the questioned documents for use as evidence, we will not assume that they would have been withheld upon application. We perceive no error in the rejection of appellant's belated effort to obtain them.

### 4. Sufficiency of the Evidence

The witness Kline thus described his use of non-interest bearing checking accounts of others as compensating balances for bank loans to himself or his corporations:

"Q  What is meant to you by compensating balances?

A This is the balance that the banks require you to leave on deposit out of the proceeds of a loan. Usually it is the proceeds of a loan, so that they make a higher yield and it also helps in the growth of the bank because it increases deposits.

Q Mr. Kline, let me give you the example of a loan of $100,000.00. Would you please apply the theory of compensating a twenty percent compensating balance to that figure?

A Yes. I would borrow a hundred thousand dollars. I would pay interest on a hundred thousand dollars. The bank wanted me to have the use of $80,000.00 and keep $20,000.00 on deposit, interest free, in a checkbook account. This money couldn't be used. It gave the bank a higher yield, and by making a hundred thousand dollar loan it also gave them an additional deposit of $20,000.00.

It was also a good practice for the bank to have this compensating balance because they have a right of offset if the loan was to the same entity that had the compensating balance and there was a default in the loan they could attach the money that was in the account.

Q What, if anything, did you do about that practice of requiring the borrower to leave his own money in the checking account?

A Well, some time in the middle sixties I came up with a method to lower my cost of borrowing and to give me the use of one hundred percent of the money borrowed.

Q What was the method that you came up with?

A The method of this was to have other entities or savings and loan associations supply compensating balances for my use.

Q Now, how did you accomplish that, Mr. Kline?

A Well, there were several ways.

One way took no money at all, and that was the easiest way, it was done with a savings and loan by me opening up a savings account at a savings and loan, getting interest on the savings account, taking the passbook or the savings certificate from the savings and loan to another institution to get my money back, and the interest I was receiving from the savings and loan would offset my interest borrowing costs at a bank, and in turn I would get the savings and loan association where I deposited said amount of money to put it in an account I directed in a demand checking account, and I would have the bank know that I brought the account in so that I would get credit for it.

So, in effect, I had use of one hundred percent of the money I borrowed, and I lowered my interest borrowing cost by twenty percent, actually twenty-five percent because if you only get the use of eighty percent of the money it is costing you an additional twenty-five percent because twenty percent is twenty-five percent of eighty.

Q One-quarter?

A Yes.

I cut my borrowing costs by twenty-five percent, and we were borrowing many millions of dollars, so it was a substantial savings."

Kline explained the role of appellant in the establishment of a compensating balance for his benefit by the deposit of funds of Montgomery Federal Savings and Loan Association in a non-interest bearing account in the Citizens Bank and Trust Company of Maryland:

"Q Had you ever talked with Mr. Stathes about that amount of money?

A Yes, sir.

Q And an account at Citizens Bank and Trust Company?

A Yes, sir.

The amount that I had talked to Mr. Stathes about was $50,000.00.

Q What, if anything, did you say to Mr. Stathes concerning the $50,000.00 account at Citizens Bank and Trust Company?

A This was in conjunction with me opening an account at Montgomery Federal for the same amount and having Montgomery Federal open an account at Citizens Bank and Trust Company, and that the Association should not borrow any money from Citizens Bank and Trust because we both couldn't get credit for the same amount and if Montgomery Federal moved from the bank then Joel Kline couldn't get credit for it. That was the reason.

I was told by Mr. Stathes that they did their primary banking at Suburban Trust Company and that that was where they would borrow money if they needed it, the Association, so there would be no problem in them putting $50,000.00 at Citizens Bank and Trust at Riverdale, and they would not have to borrow any money.

Q What purpose did you give Mr. Stathes for him placing money at the Citizens Bank and Trust Company?

A So I would get credit for the money so I could use it as compensating balances.

Q Did you use the phrase, 'compensating balances' with him?

A I am not sure if I used that phrase. I would get credit for the money, so I would be borrowing against the moneys and not you. I may not have used the phrase 'compensating balances.'

* * *

Q Mr. Kline, explain to the ladies and gentlemen of the jury, here, if you would, please, the connection between deposits and compensating balances insofar as Montgomery Federal was concerned.

A These would be accounts that I would arrange to have put into Montgomery Federal for which I would be paid interest. In return Montgomery Federal would open a checking account at a bank which I directed the account be in, and the money would stay practically dormant at an agreed upon figure, which would be the same amount I kept on deposit at Montgomery Federal Savings and Loan."

Kline also testified that in return for the creation of compensating balance non-interest bearing accounts by Montgomery Federal Savings and Loan Association, he provided or arranged for multiple favors for appellant including the following:

1. free trips to Florida, Bimini and Las Vegas;
2. a "finder's fee" of $7500 for a loan to M & K Investments;
3. the purchase by Kline from Stathes of 5000 shares of stock in the Old Line National Bank at a price substantially higher than the price then quoted for the stock.

There was substantial corroboration that appellant participated in the creation of compensating balances for the use and benefit of Kline to the financial detriment of Montgomery. There also was substantial corroboration that he received favors in the form of cash and other valuable considerations. The trier of fact would be permitted to draw the reasonable inference that the two were interrelated. The appellant himself acknowledged that a non-interest bearing checking account was opened at Citizens Bank and Trust Company of Maryland because Joel Kline asked him to put it there. He acknowledged also that he had been provided free

trips to Florida, Bimini and Las Vegas; that he had received the "finder's fee" to which Kline had referred; and that 5000 shares of his stock in Old Line National Bank had been sold to Kline at $15 per share. It is true, of course, that appellant vigorously maintained that the non-interest bearing checking account of Montgomery's funds in the Citizens Bank was opened to advance his corporation's interests and was related in no way to the receipt by him of favors. The jury was not obliged to accept that explanation. *Bromwell v. State*, 8 Md. App. 382, 387, 259 A. 2d 577, 579-80 (1969).

Kline had testified that he or his secretary would be called from time to time by Citizens Bank officials advising that the association checking account had fallen below the required $50,000 balance. He added that he or she then would so inform an officer of Montgomery. The witness Soyers, Comptroller and Assistant Secretary of Montgomery, confirmed receipt of such calls from Kline or Kline's secretary. Soyers testified that he then would advise appellant of the calls and would be told "to bring the account balance up at my convenience." Soyers added that on one or two occasions appellant later returned "to remind me to bring them [bank balances] up to $50,000." Appellant's denial of that testimony by both Kline and Soyers did no more than present a question of credibility properly to be resolved by the jury.

The record shows by a rational permissible inference that the deposit of Montgomery funds in a non-interest bearing checking account at Citizens Bank was initiated by the appellant in violation of his fiduciary duty to Montgomery and against its interest in order to achieve a personal gain detrimental to it.

The evidence was legally sufficient to convict. *Carter v. State*, 15 Md. App. 242, 247, 289 A. 2d 837, 840 (1972).

*Judgment affirmed.*
*Appellant to pay the costs.*