704 A.2d 880

**Jean Alex CLERMONT**

v.

**STATE of Maryland.**

**No. 115, Sept. Term, 1996.**

Court of Appeals of Maryland.

Jan. 20, 1998.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired, Specially Assigned).

RODOWSKY, Judge.

This is a capital murder case. Appellant, Jean Alex Clermont (Clermont), was convicted by a jury in the Circuit Court for Prince George's County of premeditated and felony murder, robbery with a deadly weapon, kidnapping, and other offenses. The death sentence was imposed by the jury.

The murder was committed about 3:00 a.m. on September 19, 1995. John E. McMullen, III (McMullen), age twenty-eight, was the victim.[1] Participating in the crimes with Clermont, then age twenty-three, were three companions with whom Clermont played basketball at the Knollwood Recreation Center and Neighborhood Park at 10400 Edgefield Drive in Prince George's County: Sean Bonner (Bonner),[2] Mark

---

1. The victim's name is incorrectly spelled "McMullin" in the autopsy report and throughout the transcript.

2. Sean is at times spelled "Shawn" in the record.

Mutu (Mutu),[3] and Rawle White (White). The State's direct proof that Clermont was the principal in the first degree to the murder is found in the testimony of White, who had plea bargained with the State.

After midnight of September 18–19, 1995, Clermont was driving his three friends in his Sterling automobile. While returning home from the District of Columbia via Georgia Avenue, they saw a 1995 Black BMW in the vicinity of the Penthouse Club. Clermont parked his Sterling nearby so that the four young men could admire the BMW, which had been leased by McMullen one week before. McMullen was waiting for his friend, Patience Odina (Odina), to get off from work at the Club. Shortly after closing time McMullen, driving his BMW, and Odina, driving a separate car, proceeded northbound on Georgia Avenue. Clermont et al. followed. They watched as McMullen and Odina stopped for gasoline for which McMullen paid in cash. Clermont et al. followed the two cars to the Capital Beltway, to Interstate 95, and to the apartment complex in Laurel where McMullen resided. In the course of that trip Clermont and his companions agreed that they would rob the couple, steal the BMW, and take it to a chop shop in New York. In preparation Clermont placed a .38 caliber handgun on his lap, put on a latex glove, and he and Bonner covered their faces with bandannas.

When McMullen and Odina had parked their cars outside of McMullen's residence and while Mutu remained in the Sterling as getaway driver, the other three felons, with Clermont wielding the handgun, forced McMullen and Odina to lie prone and robbed them. The robbers took McMullen's wallet, which contained $19 in cash, a bank withdrawal card, and credit cards. Among the contents taken from the cars of the two robbery victims was McMullen's cellular telephone. Bonner and Clermont then forced McMullen into the trunk of the BMW and slammed the lid closed. With Mutu driving White and Clermont in the Sterling, and with Bonner following in the

---

3. Mutu is at times spelled "Mootoo" in the record.

BMW while McMullen was locked in the trunk, the felons fled. Odina called the police.

Clermont directed Mutu to drive to the park at the Knoll-wood Recreation Center. Its parking lot is unlighted and has only one opening for vehicular ingress and egress. There Clermont pounded on the trunk of the BMW with the barrel of his handgun, cursed McMullen, and threatened to kill him in an effort to get the latter to divulge the PIN number or numbers for his bank and credit cards. When McMullen did not comply, Clermont drove the BMW rapidly in tight circles, and apparently over curbs or parking space blocks, with McMullen in the trunk. McMullen then disclosed a PIN number that he said was good for all of the cards in his wallet.

White testified that while McMullen was revealing the PIN number, White was approximately ten yards away, relieving himself. He heard a gunshot and immediately turned in the direction of the shot. He saw Clermont pointing his handgun against the trunk lid. The postmortem examination revealed that McMullen had been killed by a single gunshot wound that passed through his right wrist, grazed his face, and then entered the left chest wall, lacerating major blood vessels.

The felons left the park in the Sterling and went to an ATM machine at Colesville Road and University Boulevard. Mutu tried to withdraw $200 from McMullen's checking account and then from his savings account, but the number that McMullen had given them was not the authorized PIN.

At some point after the murder and before the attempt to make an ATM withdrawal, White asked Clermont why Clermont had shot McMullen. Clermont replied, "He made me impatient."

Over the next day or two the felons, using McMullen's identification at a bank's drive-in window, were able to cash a check made payable to McMullen, and they successfully used McMullen's credit card to make purchases at a shopping center. They had also been using McMullen's cellular phone. Working with the addresses of the places principally tele-phoned on McMullen's phone after his death, the police arrest-

ed Clermont on September 22 at 3:40 p.m. while he was carrying the phone. Arrests of the other felons followed swiftly. A search under warrant of Clermont's bedroom produced a .38 caliber handgun, a set of latex gloves, and a bandanna. Firearms identification testing subsequently revealed the .38 semi-automatic handgun seized at Clermont's home to be the murder weapon.

At the sentencing phase of Clermont's trial the jury found, as aggravating factors, that the victim was taken in the course of a kidnapping and that Clermont committed the murder while committing robbery. As a mitigating factor the jury unanimously found that Clermont had not previously been convicted of a crime of violence. Further, one or more, but less than all, of the jurors found to be mitigating that Clermont was the father of a small child.

In this Court, Clermont presents the following issues which we have renumbered to their sequence at trial.

I. The trial court impermissibly restricted the cross-examination of the principal State's witness;

II. The trial court erred in instructing the jury that appellant was presumed to be not guilty, and in failing to instruct that he was presumed to be innocent;

III. The court erred in admitting a written victim impact statement since it was not a part of the presentence investigation report in the sense that the statute contemplates;

IV. The trial court erred in admitting as part of the presentence investigation report appellant's prior conviction for possession with intent to distribute cocaine;

V. The trial court erred in permitting the State to cross-examine a defense witness concerning statements allegedly made by appellant to the witness;

VI. The court erred in overruling defense counsel's objection to the State's use of grand jury testimony to impeach a defense witness at the sentencing hearing;

VII. The trial court erred in excluding evidence offered in mitigation of punishment;

VIII. The trial court erred in refusing to permit appellant to exercise his right of allocution after the State's final closing argument;

IX. The court committed plain error in failing to curtail the prosecutor's improper closing argument and in failing to give a curative instruction; and

X. The Maryland death penalty law is unconstitutional.

Additional facts will be presented, as required, in the discussion of these issues.

## I. Cross-Examination of Rawle White

The defense attacked White's credibility by cross-examining him regarding the plea bargain that he had made with the State. White pled guilty to first-degree murder and agreed to testify against Clermont in exchange for a life sentence with all but thirty years suspended. Clermont claims that the portion, set forth below, of his cross-examination of White was erroneously limited.

"[DEFENSE COUNSEL] Q. You went down to the police station.

"[WHITE] A. Yes, sir.

"Q. In fact, what happened, Detective Rositch is the one who questioned you, is that correct?

"A. I guess. I can't remember his name, it's been so long.

"Q. And he said to you, I believe that [Clermont] is lying and trying to save himself, and [Bonner] is telling the truth.

"Is that what he said to you?

"A. No, sir.

"Q. He didn't say that to you?

"A. He came at me and said Alex Clermont claimed that I pulled the trigger that night.

"Q. And so you claim that Alex Clermont pulled the trigger that night.

"[STATE'S ATTORNEY]: Objection. Move to strike.

"THE COURT: Sustained. Grant the motion to strike.

"Ladies and gentlemen of the jury, the last statement is stricken from the record, and is not to be used by you in your deliberations."

Clermont submits that "[i]t was without question proper on cross-examination to explore the very real possibility that White was motivated to implicate Mr. Clermont because he had been told by a detective (truly or falsely) that Mr. Clermont had implicated him."

Every aspect of the record, however, indicates that the sentence spoken by defense counsel that is last quoted above was a declarative sentence, asserting something as a fact, and not an interrogative sentence, asking a question. Had the sentence been spoken with a rising tone, the court reporter should have ended the sentence with a question mark, but the reporter used a period. It is clear that the State's Attorney interpreted defense counsel's sentence as a statement asserting a fact. Not only did the State object, but it moved to strike, even though White had not given any answer to the question. The object of the motion to strike, which is usually accompanied by a request for an instruction to the jury to disregard certain evidence, is to remove matters which have not been properly admitted as evidence from the jury's consideration. *McCormick on Evidence* § 52, at 201 (4th ed.1992). In the instant matter defense counsel's statement of an asserted fact was not evidence and was properly the object of the motion to strike.

The record also clearly reflects that the trial court had the same understanding of defense counsel's statement as did the court reporter and the State's Attorney. The court sustained the objection, granted the motion to strike, and, without the need for an express request from the State, instructed the jury to disregard "the last statement."

The cross-examination as a whole supports the foregoing analysis. Upon taking over White on cross, defense counsel went immediately to the plea bargain. The examination then proceeded as follows:

"Q. And if you don't come here and testify, you are going to spend the rest of your life in prison, is that correct?

"A. Supposedly, sir.

"Q. So you are going to come here and tell the ladies and gentlemen of the jury everything you want them to know, is that correct?

"A. No, sir. I am going to tell them the truth, sir.

"Q. Okay. That's fine.

*"So are you going to tell me and you are going to admit to them that when you spoke to the police, you lied.*

"A. *Lied about what, sir?*

"Q. *About what happened?*

"A. *No, I didn't.*

"Q. You told the police what happened just like you told the ladies and gentlemen of the jury, is that correct?

"A. That is correct, sir."

(Emphasis added).

Defense counsel then developed details that were included in White's testimony to the jury but that were not included in a written statement that White had given to the police on September 22, 1995. In substance, the police had questioned White about, and White included in his statement, only the events up to and including the killing, while details included in White's testimony at trial included what the felons had done with the property taken in the robberies. The latter details had been first elicited in the prosecutor's pretrial interviews of White.

Then, immediately prior to the segment of the cross-examination that is at issue on this appeal, the following transpired.

"Q. Anything else you wish to add to this statement?

"What was your answer?

"A. No.

"Q. It was no.

*"But in exchange for 30 years, you will tell us anything, won't you?*

"A. *No, sir. I will tell you the truth, and the truth only.*

"Q. *Like you did with the police?*

"A. I got down to the station and they asked me to write a report of what happened that night. That is what they asked me, what happened that night, and that is what I wrote out. What happened that night.

"They never asked me what happened afterwards.

"Q. You went down to the police station.

"A. Yes, sir."

(Emphasis added).

These passages reflect that when defense counsel asked, as questions, whether White had lied to the police, the court reporter transcribed them as questions, the State did not object, and the court did not strike the questions. Further, after twice suggesting to the jury by direct questions to White that White was lying, and having twice gotten a flat denial of that accusation, defense counsel had no reasonable expectation of getting White to agree on a third try that White lied to the police. Thus, even if defense counsel used a rising tone to indicate a question, the trial court could, under the circumstances, consider that defense counsel was not really seeking an answer, but that defense counsel was simply indulging in a tactic to focus the jury on the legal issue that would be affected if the jury believed that White was lying.

In any event, if we treat the sentence in issue as a question, it is at best an argumentative one. An argumentative question is one which incorporates by assumption a fact otherwise not in evidence. *See ACandS, Inc. v. Godwin,* 340 Md. 334, 415, 667 A.2d 116, 155 (1995). Wigmore states that "[a] question which *assumes a fact* that may be in controversy . . . may become improper on *cross-examination,* because it may by implication put into the mouth of an unwilling witness, a statement which he never intended to make, and thus incorrectly attribute to him testimony which is not his." 3 Wigmore, *Evidence* § 780, at 171 (Chadbourn rev. ed.1970). McCormick writes that one danger of the argumentative ques-

tion is that "the answer is likely to be misleading. Oftentimes, the question will be so separate from the assumption that if the witness answers the question without mentioning the assumption, it is impossible to ascertain whether the assumption was ignored or affirmed." *McCormick on Evidence* § 7, at 22–23 (4th ed.1992).

Here, if we view defense counsel's sentence as a question, the question is: "And so, you claim that Alex Clermont pulled the trigger that night?" That question carries considerable baggage in the introductory "And so." The full inference from "And so" is "Because you are motivated to retaliate against Clermont because of his false accusation against you." Thus, if the State had not protected the witness by the timely objection, and White had answered, "Yes," to the "question" in the form in which it was asked, the jurors would not be able to tell whether White was agreeing only that he claimed that Clermont pulled the trigger, or whether he was also agreeing with the baggage concerning his motivation for that claim. Thus, the objection was properly sustained, and the jury was properly instructed, in effect, not to consider that the motivation attributed by counsel was in evidence.

## II. Jury Instructions

Clermont submits that the trial court misdirected the jury in the guilt or innocence trial by instructing that he was presumed to be "not guilty" rather than presumed to be "innocent."[4] Clermont concedes that no objection was raised to this instruction at the time it was given so that the issue is

---

4. The instruction reads as follows: "The defendant in this case, Mr. Clermont, is presumed to be *not guilty* of the charges. This presumption remains with him throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that he is guilty." (Emphasis added).

 In his instruction as to motive, the trial court did use the word "innocence," instructing the jury that "you may consider the motive or lack of motive as a circumstance in this case. Presence of motive may suggest guilt. *Absence of motive may suggest innocence.* You should give the presence or absence of motive, as the case may be, the weight you believe it deserves." (Emphasis added).

not preserved for appellate review. Nevertheless, Clermont urges us to apply the plain error doctrine. In *Rubin v. State,* 325 Md. 552, 602 A.2d 677 (1992), we defined plain error as one which "vitally affects a defendant's right to a fair and impartial trial." *Id.* at 588, 602 A.2d at 694 (citing *State v. Daughton,* 321 Md. 206, 210–11, 582 A.2d 521, 523 (1990)).

█ On the facts of the instant case, the error, if any, in using the words "not guilty" to describe the presumption of innocence does not rise to the level necessary to constitute plain error.

In *Bruce v. State,* 328 Md. 594, 616 A.2d 392 (1992), this Court emphasized that the trial judge's instructions to the jury must accurately convey the concept of reasonable doubt but need not use any particular language. *Id.* at 616, 616 A.2d at 403. More recently, *Merzbacher v. State,* 346 Md. 391, 697 A.2d 432 (1997), held that "the law does not enshrine any particular form of the reasonable doubt instruction. . . . '[S]o long as the [trial] court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.'" *Id.* at 400, 697 A.2d at 436–37 (citing *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583, 590 (1994)).

Here, the trial court accurately set forth the State's burden of proof. The jury was told that the defendant "is not required to prove his innocence," and that if the State did not prove guilt beyond a reasonable doubt then the defendant must be found not guilty. Taken together, these instructions accurately and completely convey the burden of proof and the defendant's presumption of innocence. The mere use of the words "not guilty" instead of "innocent" at one point in the charge may well be error, but it is not plain error in the context of the charge as a whole.

### III. Victim Impact Statement

Article 27, § 781(a) provides in relevant part:

"A presentence investigation that is completed by the Division of Parole and Probation under Article 41, § 4–609 of the Code shall include a victim impact statement, if:

(1) The defendant, in committing a felony, caused physical . . . injury to the victim[.]"

Md.Code (1957, 1997 Repl.Vol.), Art. 41, § 4–609(d) reads:

"In any case in which the death penalty . . . is requested under Article 27, § 412, a presentence investigation, including a victim impact statement as provided under Article 27, § 781 of the Code, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413."

Here, Clermont contends that the sole victim impact statement that was admitted at sentencing was not included in the presentence investigation report (PSI) in the manner required by Article 41, § 4–609. The contention is that a victim impact statement must first be filtered through an investigator of the Department of Parole and Probation whose responsibility, for example, would be to exclude known false information or that furnished by the mentally ill and delusional. Where the victim impact statements are collected by the prosecutor, as we shall assume happened here, Clermont submits there is a danger that the prosecutor may influence, even unwittingly, the content of the statement.

 Under the circumstances of the instant matter, there was no error. In the instant case court and counsel had met well in advance of trial to discuss the PSI and the victim impact letters that were going to be submitted from out of state.[5] It was agreed that the letters would be prepared, addressed to the court, and the prosecutor would furnish a copy of each letter to Clermont's counsel. In accordance with the arrangement the court also ordered Parole and Probation

---

5. For at least three generations the McMullens have lived in Darian, Georgia.

to prepare a "bare bones" PSI. These materials would then be reviewed and objections considered.

These materials were considered on October 22, 1996, the day before the court commenced hearing evidence in the sentencing phase. Defense counsel had previously received a PSI to which they had objections, and they had received that morning a "stack" of victim impact statements. Clermont argued that the statements could not be used because they were not included in, or incorporated as part of, the PSI prepared by Parole and Probation. The court stated that it could correct that deficiency by having Parole and Probation include the victim impact statements in the PSI before the sentencing hearing began the next day. In the course of the hearing the court sent for the probation officer who, upon arrival, remained available in chambers to revise the PSI in accordance with the rulings that the court made at the hearing.

The court then addressed Clermont's objections to the content of the victim impact statements and of the PSI. As a result of its rulings the court ordered the probation officer to delete from the PSI, as considered at the hearing, everything to which Clermont had objected. The court also excluded all of the proposed victim impact statements except a two-paragraph letter, dated February 12, 1996, from McMullen's sister, a resident of Georgia, addressed to the trial judge. During the review of the proposed victim impact statements, defense counsel told the court that the letter from the decedent's sister was "the only appropriate statement." Clermont's counsel further stated, "I think this is the only one that should be allowed to be submitted to the jury." The PSI, with the victim's sister's letter attached, that was put in evidence on October 23, 1996, was signed by the probation officer and by her supervisor on October 22, 1996.

Here, a PSI was introduced at the sentencing hearing, that PSI included a victim impact statement, and the victim impact statement included in the PSI was the only victim impact statement introduced. Consequently, the requirements of

§ 4–609(d) were satisfied. *See Ware v. State*, 348 Md. 19, 62–64, 702 A.2d 699, 719–21 (1997). "Neither § 4–609(d) nor our opinion in *Williams* [*v. State*, 342 Md. 724, 679 A.2d 1106 (1996)] dictates any particular person or agency as the responsible party for procuring the victim impact statements that ultimately become a part of the PSI." *Id.* at 63, 702 A.2d at 720.

■ Further, any error is necessarily harmless beyond a reasonable doubt. Clermont acknowledged that the content of the only letter incorporated by attachment as part of the PSI was appropriate as a victim impact statement, and we agree with that conclusion.

## IV. PSI Inclusion of Prior Conviction for Non–Violent Crime

The PSI referred to Clermont's conviction in Prince George's County on June 16, 1992, for possession of cocaine with intent to distribute. Under Clermont's analysis of *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), any evidence of a prior non-violent offense, even if evidenced by a judgment of conviction, is inadmissible in a death penalty case.

This issue has not been preserved. When the PSI was introduced defense counsel stated that they had no objection, because at the prior day's hearing, the court ordered removed from the PSI everything to which the defense had objected. At that hearing Clermont's counsel had told the court "any detainer comes out [of the proposed PSI], but the June 16th possession with intent to distribute cocaine stays in. We agree that that stays in."

■ In any event, there is no merit to Clermont's contention. The argument now advanced was rejected in *Conyers v. State*, 345 Md. 525, 571–72, 693 A.2d 781, 803–04 (1997). There Conyers argued that *Scott* " 'restricts the type of evidence relating to other crimes that is admissible ... to evidence of *crimes of violence* for which there has been a conviction.' (Emphasis added)." *Id.* at 571, 693 A.2d at 803. We said that such an argument "considered a lone phrase out

of context," and that it "misconstrued *Scott's* discussion of [Article 27,] § 413(g)." *Id.* Accordingly, in *Conyers,* we held that six or seven findings of delinquency in Conyers's juvenile record, that was included as part of the PSI, were properly admitted in evidence against him. It was "of no consequence that [Conyers's] adjudicated charges are not definable as crimes of violence." *Id.* at 572, 693 A.2d at 804.

## V. Cross-Examination By State Of Mitigation Witness

At the sentencing phase Veronica Shields (Shields), then age twenty, was called as a witness by Clermont. Clermont is the father of her son who was born in September 1994. The relationship between the witness and Clermont had ended in June of 1995. On direct examination Shields described the relationship between Clermont and his son.

On cross-examination, when the State began to question Shields about conversations that she had had with Clermont while he was confined prior to the subject trial, Clermont objected on the ground that the examination was beyond the scope of direct and that it was cumulative. The court overruled the objection, stating that it would limit cross-examination to principalship in the first degree and the two aggravating factors. The State volunteered to "go with the aggravating factors and not the issue of first degree." Thereupon, the State quickly developed by leading questions that Clermont had told Shields that he and the three others were involved in a robbery, that they had put a man in the trunk of his car and taken the car to a park, and that Mutu had attempted to use ATM cards at a bank machine. The following then transpired.

"Q. And that the gun was his, the .380 that was used in this homicide?

"A. No.

"Q. He didn't tell you that?

"A. No.

"Q. He didn't tell you he had a gun?

"A. He said he had a gun, but it wasn't his.

"Q. And he said that was the gun that went off, is that correct?

"A. Yes.

"Q. And that he had that gun?

"A. No.

"Q. It was his gun?

"A. It wasn't his gun. It was a cousin's gun.

"Q. But he had that gun?

"A. Yes."

That concluded the cross-examination.

On redirect, defense counsel immediately elicited the following:

"Q. Did he tell you that he shot Mr. McMullen?

"A. No, he didn't.

"Q. Did he tell you anything about that?

"A. Yes, he did.

"Q. Can you tell the court what he told you.

"A. He said that it was an accidental shooting. That he didn't do it. That another person did it, and he was trying to stop him from the gun going off, and the gun fell to the ground and he picked it up."

One witness (whose testimony comprises six pages of transcript) testified after Shields and was immediately followed to the stand by Clermont, whose testimony at the sentencing phase comprises sixty-three pages of transcript. Clermont testified that the handgun that he was carrying that night was owned by his cousin. Clermont testified that, at the time of the shooting, he was holding the handgun by the handle in his right hand with his index finger on the side of the weapon when Bonner grabbed the gun and that Bonner's finger was on the trigger when the handgun fired.

██ In this Court Clermont argues that the trial court erred in permitting the cross-examination of Shields to extend beyond the scope of her direct examination. Maryland Rule 5–611(b)(1), in relevant part, provides:

"[C]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.... [T]he court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

The trial court did not abuse its discretion in permitting cross-examination to exceed the scope of direct. The court limited the expanded scope of the cross-examination to the threshold factual propositions, relevant to sentencing, that the State was required to prove.

After the trial court had enlarged the scope of cross-examination, the State examined by leading questions, but there was no objection to the form of the questions. The lack of any objection to the form of the questions may simply indicate defense counsel's willingness to let the witness be led over points that were not disputed. Even on the disputed issue of who was the principal in the first degree, Shields literally said no more in response to the leading questions than that the gun that went off was owned by Clermont's cousin but in Clermont's possession. Any indefiniteness in the witness's recital of what Clermont said about when Clermont had the handgun in his possession, in relation to the time when the weapon fired, was cleared up on redirect in a manner favorable to Clermont.

In any event, the error in proceeding by leading questions in the expanded cross-examination of Shields, if preserved, is harmless beyond a reasonable doubt. The responses by Shields were generally consistent with Clermont's own description of how the shooting came about, and were certainly not more prejudicial to Clermont than Clermont's own version of the events.

### VI. Alleged Discovery Violation

During the State's cross-examination of Shields the prosecutor attempted to impeach Shields with a statement made by Shields in her grand jury testimony. On her direct examination Shields testified that Clermont took care of their

child from age six weeks to age six months, when Clermont returned to work. On cross-examination she gave the child's birth date as September 8, 1994, which would have meant that Clermont returned to work in March 1995. On cross-examination she acknowledged testifying before the grand jury that December 19, 1994, was "the last time [Shields] knew [Clermont] to work." At trial she said that, before the grand jury, she forgot about Clermont's going back to work.

Clermont objected on the ground that the grand jury testimony of Shields should have been furnished in open file discovery, but had not been, so that there was a discovery violation. The prosecutor represented to the court that he had informed defense counsel "before we started" that Shields had testified before the grand jury. The trial court stated that it would have been a violation of law for the prosecutor to have given the grand jury testimony to defense counsel without a court order. Clermont's request that the subject portion of the cross-examination be stricken was denied.

In this Court Clermont submits that the trial court committed "decisional process error." The argument is that the ruling of the trial court should be interpreted as premised on the belief that the trial court had no power to deal with the discovery violation in the absence of an order authorizing disclosure of the grand jury information. This erroneous assumption led the trial court, so the argument goes, to fail to realize that it had the power to remedy the discovery violation by striking the testimony. As a further embellishment on that position, Clermont argues that the trial court failed to perform the analysis applicable to the choice of remedy for a discovery violation that is described in *Taliaferro v. State,* 295 Md. 376, 390–91, 456 A.2d 29, 37, *cert. denied,* 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983).

There was no discovery violation. Open file discovery is simply a substitute for formal discovery under Maryland Rule 4–263, dealing with discovery in criminal causes pending in the circuit courts. Shields was a witness called by the defense. Rule 4–263 does not require material potentially impeaching of

a defense witness to be produced by the State in discovery. Nor was the material required to be produced under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Consequently, Clermont had no right to expect the material to be produced in open file discovery.

## VII. Exclusion of Evidence Offered in Mitigation

Clermont raises as error rulings at the sentencing phase that sustained objections by the State during the direct examination of two different witnesses in Clermont's case. One witness was Clermont, and the other was Catherine Miller (Miller). As explained below, each ruling was within the trial court's discretion.

### A

 For the ten years preceding trial Miller was the vice principal of the high school attended by Clermont. Clermont graduated in the spring of 1992 at age twenty. During his last year in high school, in September 1991, Clermont had been charged with possession of cocaine with the intent to distribute and, at some point, convicted. Miller had made great efforts to enable Clermont to graduate before he went to jail. After his graduation he was sentenced on June 16, 1992, to three years confinement with all but ten months suspended.

Miller testified that, throughout his high school matriculation, Clermont's attendance was good, his grades were average, and he behaved in school. The ruling at issue then arose in the following context:

"Q. Did you ever know [Clermont] to get into a fight?

"A. No, not as far as I can remember. I don't remember him ever being in a fight in that school.

"Q. Do you know Alex as a violent person?

"A. No. I don't.

"Q. Do you feel safe around Alex?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained."

There was no error in the ruling. The questioning had progressed, without objection, from the fact that Miller did not recall Clermont's ever being involved in a fight to what could be construed as an opinion based on those facts, namely, that Clermont was not a violent person. Defense counsel came back to the well again, inquiring whether Miller felt safe around Clermont. The questioning thereby moved from what was, arguably, objectively determinable to subjective opinions or feelings.

Miller's feelings were of little, if any, relevance. Indeed, the trial court had alerted counsel during the guilt or innocence phase as to how it would rule on questions about a witness's feelings. On redirect examination by the State, White had been asked: "How do you feel about coming in here and testifying against Mr. Clermont?" Clermont objected and the court sustained the objection. Further, there is no evidence that Miller had had any contact with Clermont after his graduation and imprisonment. Thus, the distance in time and difference in circumstances further reduced any relevance of Miller's feelings. Indeed, inasmuch as her feelings, so far as the record shows, were based on the contacts with Clermont that she described in her testimony, her subjective feelings can be viewed as cumulative.

For all these reasons the trial court did not abuse its discretion in closing off inquiry into Miller's feelings.

## B

As the reason why the jury should not impose a death sentence Clermont testified that he had made a promise to his son when the child was born that Clermont would always be there for him and be a father to him, because Clermont's father had not been a father to Clermont. His counsel then asked, "[W]hat type of father do you believe you could be to your son?" The prosecutor objected, and the court sustained the objection. Defense counsel thereupon concluded the direct examination of Clermont, without making any proffer.

Clermont argues, citing *Mills v. State*, 310 Md. 33, 527 A.2d 3 (1987), *vacated on other grounds*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), that the anticipated answer is apparent from the tenor of the question, so that the absence of a proffer does not defeat appellate review. *Mills* recognized an exception to the requirement for a proffer " 'where the tenor of the questions and the replies they were designed to elicit is clear. . . .' " *Id.* at 46, 527 A.2d at 9 (quoting *Peregoy v. Western Maryland RR. Co.*, 202 Md. 203, 209, 95 A.2d 867, 870 (1953)). Here, the question, viewed precisely, sought Clermont's subjective belief concerning a future course of conduct and, responsively to the question, that belief could have been expressed in qualitative terms, such as "excellent," "loving," or "caring." A response of that nature would have been of such minimal, if any, relevance, under the circumstances of the instant matter that the court did not abuse its discretion in excluding an answer.

Inasmuch as Clermont had already testified to his desire to maintain a close relationship with his son if Clermont's life were spared, we shall assume, by a liberal application of the *Mills* exception, that the question put to Clermont sought an explanation of how Clermont would maintain that relationship if his life were spared. That explanation had already been given in evidence by the child's mother, Shields.

Shields testified that "for a man his age [Clermont] was an excellent father." She said that Clermont took care of the child, while Shields was working, from age six weeks until age six months, when Shields was laid off and when Clermont "got his job back at Maryland University." In July of 1995 Shields had a night job, and Clermont cared for the child twenty-four hours a day during the work week.

Shields further testified that, since Clermont had been confined, he tried to telephone Shields's home every other night in order to talk to the child. Someone, presumably primarily Shields, takes the child to visit Clermont every weekend. She said that the visits are difficult for both father and son because the child is used to having Clermont pick him

up and play with him. She said that during the prison visits the child "sits at the window and bangs against it, because he is frustrated, because he can't touch [Clermont]."

Thus, even by a liberal application of the *Mills* exception, we divine no answer to the question put to Clermont that would not be cumulative.[6]

## VIII. Defendant's Right of Allocution

Clermont contends that the trial court committed reversible error by refusing his request to allocute after the State's rebuttal closing argument. The issue arose as set forth below:

"[DEFENSE COUNSEL]: I have a question.

"What is your understanding of when he allocutes?

"My understanding is that he is going to testify, and he still has the right to allocute after argument.

"THE COURT: No, I disagree with that. The State has the last say here. Now, I think it can either be after the State's first argument and before your argument, or after your argument, but it is clearly before the State's Attorney comes in for rebuttal.

\*　　\*　　\*　　\*　　\*　　\*

"[DEFENSE COUNSEL]: Two issues, if I may, Your Honor.

"The first issue is the issue of allocution. I think we both agree that the defendant has an absolute right to allocute, which is in addition to any argument made by counsel for the State or counsel for the defense.

"It is my position and my request that after closing argument by counsel the defendant address the jury by allocution. I think historically in our jurisprudence system, before sentence is imposed the last person that the sentencing authority hears from is the defendant.

---

**6.** Appellate counsel suggest that Clermont might have said that his confinement would be a continuing reminder to his son of the consequences of criminal behavior. That spin on a life sentence could have been argued without the need for any testimony to that effect.

"In a normal proceeding the court would say to the defendant, do you have anything to say before sentence is imposed?

"THE COURT: Do you have any authority other than what you have just given me as to how—the order for that in a death penalty proceeding?

"[DEFENSE COUNSEL]: There is no authority.

 * * * * * *

"THE COURT: I will deny that request. I believe that since the State has the burden of proof in this trial that the State will have the last argument to the jury.

"Mr. Clermont has an absolute right to allocute, and that can either be after the State's first argument and before the defense argument, or after the defense argument and before the State's rebuttal argument, and I will review that tactical decision."

Clermont allocuted immediately following the State's closing argument in chief, and before defense counsel gave closing argument on his behalf.[7]

■■■ Clermont's position in the trial court was that he had an unqualified right to have the last word. In this Court his position is that the defendant in a capital case "should, upon request, be afforded the valuable right of the final word to the sentencer, absent some compelling reason for a contrary result." Brief of Appellant at 15. The State takes the position that, because it bears the ultimate burden of persuasion, it has the last word at a capital sentencing proceeding. For the reasons that we set forth below we hold that the rule governing the timing of allocution is the converse of that for which Clermont contends in this Court, that is, absent some compel-

---

7. In its entirety Clermont's allocution reads as follows:

"First of all, I would like to apologize to the family and the loved ones, because I am very sorry for the part that I took in this drama, and there is nothing that I can do to bring his life back, but I feel right now, I have taken responsibility for my part in taking Mr. McMullen's life, and I want to apologize to the family, and tell them that I am very sorry, and I would like to ask the jurors for mercy."

ling reason for a contrary result, the State has the last word before the jury in a capital sentencing. It necessarily follows that any allocution by the capital defendant almost universally must precede, at some point, the State's rebuttal closing argument.

 Maryland Rule 4–343, since July 1, 1984, expressly has provided for allocution in capital cases. The provision, presently Rule 4–343(f), reads: "Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement." The rule does not specify when, "[b]efore sentence is determined," the allocution may or must be made. A rule dealing with capital sentencing proceedings [former Maryland Rule 772A] had been adopted effective January 1, 1979, but that rule did not contain an allocution provision. Consequently, between January 1, 1979, and July 1, 1984, allocution in capital cases was governed by common law. *Harris v. State*, 306 Md. 344, 353, 509 A.2d 120, 124 (1986) (*Harris IV*). Minutes of the Rules Committee's consideration of the provision for allocution in Rule 4–343 do not state any intention to create an unqualified or presumptive right in the capital defendant for the absolute last say before the jury by way of allocution.[8]

In *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986), we described the somewhat hybrid nature of allocution in capital cases, saying:

---

8. In *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986), we described the proceedings of the Rules Committee at its meeting of October 15/16, 1982, when the allocution provision for Rule 4–343 was considered. *See id.* at 197–98, 507 A.2d at 1111. The portion of the minutes specifically dealing with the timing of the allocution reads as follows:

"[The Chief of the Criminal Division of the Attorney General's Office] asked whether the right of allocution, if permitted in capital cases, should be limited to being exercised before final arguments are made. The Chairman suggested that the timing of allocution ought to be left to judicial discretion. [The Criminal Division Chief] noted that she anticipates concern in the State's Attorney[s'] office[s] about unsworn statements being made by the defendant immediately prior to the jury's retiring to consider its verdict."

"The obvious purpose of Rule 4–343[ (f) ] is to afford the death penalty eligible, convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination. In this respect the statement is similar to closing argument, but it is not completely analogous to closing argument because the factual content of the allocution is not limited, in general, to the record in the case, inferences therefrom, and matters of common human experience. In that allocution is unsworn and is not subject to cross-examination, it is not testimony in the conventional sense. Nevertheless allocution may be considered by the sentencing authority."

*Id.* at 198, 507 A.2d at 1111. Viewing allocution as argument would not assist Clermont's submission. In *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988) (*Harris V*), we held:

"The short of it is that in a capital sentencing proceeding the State has the ultimate burden of persuading the jury to impose a death sentence.... Thus, under the normal Maryland rule, the State was entitled to open and close."

*Id.* at 257, 539 A.2d at 652. Judge McAuliffe dissented on other grounds from that portion of the opinion in *Harris V*, but he agreed that "because the State bears the ultimate burden of proof in a capital sentencing proceeding, it is appropriate to afford the State the right to open and close in final argument." *Id.* at 265, 539 A.2d at 656–57.

Similarly, in *Harris IV*, we considered whether allocution was "argument" within the meaning of Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 413(c)(2), providing that "[t]he State and the defendant or his counsel may present argument for or against the sentence of death." There the trial court had prevented the defendant from both allocuting and having his counsel present a closing argument to the jury. We held that the trial court erred "[s]ince allocution is neither synonymous with nor encompassed by the term 'argument.'" 306 Md. at 352, 509 A.2d at 124.

Although allocution is unsworn and not subject to cross-examination, our cases have emphasized allocution's testimoni-

al aspects. The most important of these is that information that comes to the jury only in the form of allocution may be used by the jury, if it so finds, in determining the existence of one or more mitigating circumstances. We made this clear early on in *Booth* (using language that antedated *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)[9]):

> "Under Md.Code ... Art. 27, § 413(g)(8) the sentencing authority may find by the preponderance test '[a]ny other facts which the [sentencing authority] specifically sets forth in writing that it finds as mitigating circumstances in the case.' In Booth's case, after the jury had found the aggravating circumstance of murder in the course of robbery, the jury was free to find as a mitigating circumstance such aspect of the content of Booth's allocution on which the jury could unanimously agree, simply by specifically setting it forth on the sentencing form. Further, if the jury found any such mitigating circumstance in the allocution the jury was obliged to weigh that mitigating factor in determining whether the sentence should be life or death."

*Id.* at 198–99, 507 A.2d at 1111–12. *See also Hunt v. State*, 321 Md. 387, 435, 583 A.2d 218, 241 (1990) ("The jury may consider the allocution and find the existence of a mitigating factor based upon it."); *Harris IV*, 306 Md. at 358, 509 A.2d at 127 ("Although evidence of mitigating circumstances ... can be introduced by means other than allocution, the allocutory process provides a unique opportunity for the defendant himself to face the sentencing body...").

We have relied on the testimonial nature of allocution in holding, in a case in which the convicted murderer did not testify as a sworn witness at the capital sentencing proceeding, but did allocute, that there was no violation of the defendant's right against self-incrimination when the State in

---

**9.** Maryland Rule 4–343(e) now provides for a verdict form under which any statutory or non-statutory mitigating circumstance may be found by one or more but fewer than all twelve of the jurors, after a reasonable period of deliberation.

its summation argued that the allocution was not under oath, not subject to cross-examination, and should not be believed. *See Booth,* 306 Md. at 194–210, 507 A.2d at 1110–18. *See also Hunt v. State,* 321 Md. at 436, 583 A.2d at 241 ("[T]he prosecutor is free to tell the jury that they *should not* consider the defendant's allocution; however, the prosecutor is not free to tell the jury that they *could not* consider the allocution.").

We have also held that it was error to include in a jury instruction on allocution that the statement in allocution is not evidence or testimony. *Hunt v. State,* 321 Md. at 440–41, 583 A.2d at 244. In *Hunt,* the error was rendered harmless because the court explicitly told the jury that it could consider the allocution which " 'may be a basis for establishing mitigating circumstances in imposing a life sentence.' " *Id.*

Finally, the testimonial character of allocution is perhaps most forcefully illustrated by *Harris V* where we held that it was reversible error to instruct the jury that allocution was not evidence and at the same time to instruct the jury that it may consider only the evidence in the case in deciding upon the sentence. *Harris V,* 312 Md. at 254–55, 539 A.2d at 651.

The decisions of this Court, reviewed above, strongly indicate that, for purposes of timing, allocution logically should be classified with testimony.

Nor is it helpful to analogize to the practice, if any uniform practice there be, in the timing of allocution at sentencings in non-capital cases. " 'Today the most practical rationale underlying allocution is that it provides an opportunity for the offender and defense counsel to contest any disputed factual basis for the sentence and to persuade the judge to impose a sentence favored by the offender.' " *Shifflett v. State,* 315 Md. 382, 387, 554 A.2d 814, 817 (1989) (quoting A.W. Campbell, *Law of Sentencing* § 72, at 232 (1978)). In the capital sentencing proceeding, the mechanism for contesting disputed facts relevant to sentencing and for persuading the sentencer to impose a favorable sentence is enlarged beyond allocution to *a full trial.* In addition, our cases permit the convicted murderer to place mitigating information, including the mur-

derer's version of disputed facts, before the sentencing authority at that full trial without being subject to cross-examination. This sentencing trial which includes the right to allocute, sufficiently satisfies "the most practical rationale underlying allocution," as drawn from the non-capital context. There is no need to go to the extreme of preventing the State from fairly commenting on any allocution by ruling that the State's rebuttal summation to a jury must precede the allocution.

 Clermont relies upon *Thanos v. State*, 330 Md. 77, 622 A.2d 727 (1993), as support for his claimed right to have the last word in a jury capital sentencing. *Thanos* was a capital sentencing proceeding before the court, sitting without a jury. *Id.* at 82, 622 A.2d at 729. Thanos had attempted suicide numerous times while in prison. *Id.* His trial counsel feared that Thanos would make inappropriate remarks in allocution. Trial counsel therefore urged that Thanos allocute early in the defense testimony phase of the sentencing proceeding, so that the sting of the anticipated remarks would be lessened by the time of actual sentencing and so that defense psychiatric witnesses could observe Thanos allocuting and take those observations into account in their opinions. Thanos, however, insisted on speaking at the end of the proceedings. The trial court deferred to Thanos's desire. "True to [trial] counsel's fears, after closing arguments, Thanos offered an inappropriate allocution...." *Id.* at 87, 622 A.2d at 732. Before this Court Thanos's appellate counsel argued that the timing of allocution was a tactical decision for trial counsel. We said that " 'the defendant ordinarily has the ultimate decision when the issue at hand involves a choice that will inevitably have important personal consequences for [the defendant] and when the choice is one a competent defendant is capable of making.' " *Id.* at 89–90, 622 A.2d at 733 (quoting *Treece v. State*, 313 Md. 665, 674, 547 A.2d 1054, 1058–59 (1988)). We then held that "[t]he decision whether and when to allocute ... is such a choice." *Id.* at 90, 622 A.2d at 733. We observed that we would "not now countenance defense counsel's effort to

deny Thanos this precious opportunity for rebuttal merely because he failed effectively to seize it." *Id.*[10]

*Thanos* differs materially from the instant case. First, in *Thanos*, the trial court was the sentencing authority. Second, the issue in *Thanos* was who, between the defendant and trial counsel, made the decision as to the timing of allocution. But the choices open to counsel or client were within a range set by the court. The holding in *Thanos* that the defendant makes the decision is not the same as saying that the defendant controls the timing of allocution in either a court or jury sentencing to the exclusion of the judge. In the court sentencing in *Thanos* the judge decided to permit Thanos to allocute after closing arguments. Thanos sought to allocute at that point in the proceedings, but it was the judge who decided whether or not to grant the request.

Similarly, in the jury capital sentencing context, should a conflict between the defendant and trial counsel emerge over when allocution will be made, the holding from *Thanos* that the decision is ordinarily that of the defendant will be transportable to the jury context. But, in that context, the court's discretion in establishing the defendant's range of options is additionally subject to the constraints of a jury

---

**10.** The term "rebuttal" as used in the above-quoted excerpt from *Thanos* means, in the context of that opinion, to refute or explain. It does not mean the right to close. Immediately prior to the quoted language in *Thanos*, the court had quoted from *Shifflett v. State*, 315 Md. 382, 554 A.2d 814 (1989). *Shifflett* was a court sentencing in a non-capital case. There, after defense counsel's presentation, the defendant waived allocution. The court then called upon the prosecutor for a sentencing recommendation (thus indicating that allocution is not the "last word" in all non-capital cases). The prosecutor recommended a sentence higher than one under the sentencing guidelines, contending that this was justified because the defendant had lied to the probation officer. The defendant sought to answer the accusation, but the court refused to hear the explanation. We held that the trial court had abused its discretion because "[t]he ability to speak in mitigation of punishment under the circumstances of this case necessarily entailed the opportunity to respond to the new substantive remarks of the prosecutor." *Id.* at 388, 554 A.2d at 817. In the case now before us no new matter was injected by the prosecutor in the State's rebuttal summation.

proceeding. In a jury capital sentencing, the later any allocution is postponed in the proceedings, the greater is the opportunity for sandbagging and for confusing the jury. Concern for the integrity of the verdict underlies the comments of the Supreme Court of New Jersey on the Maryland allocution rule, as exemplified by *Booth*. That court said:

> "Maryland now permits allocution by a defendant before capital sentencing.... The capital Maryland procedure would permit more than we contemplate in that it seemingly would allow the defendant to deny the killing. That would be more than a plea for mercy and should expose the defendant to impeachment."

*State v. Zola*, 112 N.J. 384, 430, 548 A.2d 1022, 1045–46 (1988). As the jury capital sentencing cases reviewed above make clear, "[w]hile denied the opportunity to cross-examine the defendant, the prosecutor may comment upon the allocution." *Hunt*, 321 Md. at 435, 583 A.2d at 241. That cannot be done if the defendant has the last word.

In sum, allocution has heavy testimonial overtones and is logically treated as part of the testimony in a capital sentencing. The trial court has discretion to postpone allocution to immediately following the State's summation in chief, to immediately preceding the State's summation rebuttal, or, in a court capital sentencing, until after the State's rebuttal summation. Moreover, in a jury capital sentencing, however, the trial court, under compelling circumstances, may permit allocution to be postponed until after the State's rebuttal summation. No compelling circumstances are presented here. Accordingly, the trial court did not err in denying Clermont's request to allocute after the State's rebuttal summation.

## IX. Prosecutor's Summation

Set forth below in italics are three portions of the summation in chief by the State at the sentencing phase. Clermont contends that the italicized portions of the argument are so improper that the trial court committed plain error by failing,

on its own initiative, to intervene and cut off the arguments or, similarly on its own initiative, to give a curative instruction.

In its summation in chief the State initially reviewed the evidence that described the victim and his character. The State then reviewed the crimes step by step, from the robberies through the kidnapping to the murder. At each step in the narrative the State urged the jury to consider what was going through McMullen's mind. The State argued that nothing in Clermont's conduct that evening mitigated the murder. Then the prosecutor undertook to persuade the jury that death, and not life without parole, was the appropriate sentence for so horrible a crime. In that context, the prosecutor said:

"You see, what we end up doing, as we go through this, as we create this horribleness, everyday as we hear more and more graphic things as more ghastly deeds come to our attention, and we think about what penalty should be imposed, we say that deserves the death sentence. How bad can it be?

"If you can envision something worse, maybe this case doesn't deserve it?

"Again, the easy answer is life without parole, but I say to you this is about more than that. This is about crime, and this is about punishment.

"Will it make a difference?

"I don't know.

"Will it change the way things are?

"Probably not.

*"But to look at it any other ways would be to demean and diminish what happened in this case, and to diminish the life of one man.*

"He stands before you and asks for mercy. John asked for mercy, too. John also asked for his life. And he did nothing to deserve what he got. There was no reason for any of this having to happen. There was no reason for that killing to happen.

\* \* \* \* \* \*

"[The victim was] [s]omebody who dared to resist, somebody who was not giving him what he wanted, and so he did it. He did it without so much as a thought. *No sentencing form, no instructions, no signature.* He put that gun down and pulled the trigger, and he takes the stand during this proceeding to let you see a human side of him.

"I am not a cold-blooded killer. I care about things, is what he said. Spare my life and give me an opportunity.

"He forfeited that and a claim to humanity when he did what he did. *You give this man life, and what you are giving him is all the things he chose to deny to Mr. McMullen.*

"*You give him life, you give him a place to stay. You give him a bed to be comfortable in, you give him clothes to wear, you give him soap to clean himself. You give him a shower a day, you give him an exercise room. You give him—*

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained.

"[PROSECUTOR]: *You give him a voice to hear and a place to go when he is sick. That is what you are giving him, and there are times when the crime and the punishment must equal each other.*"

Clermont's blanket contention is that at a capital sentencing proceeding the State's final argument, other than addressing issues related to principalship in the first degree, is limited to aggravating circumstances, mitigating circumstances, and whether the former outweigh the latter. Encompassed, however, within the generality of those issues is the burden of the State to persuade the sentencing authority that the aggravating factors preponderate and that the circumstances of the crime and the character of the defendant justify the sentence, either death or life without parole, that the State seeks. In the instant matter the prosecutor sought those objectives within the bounds of permissible argument.

Clermont submits that the statement that life without parole would "diminish the life" of McMullen is an appeal to

"eye for eye" justice. In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the opinion announcing judgment said: " 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337[, 1343] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men." *Gregg,* 428 U.S. at 183, 96 S.Ct. at 2930, 49 L.Ed.2d at 880. This Court cited and relied on the passage in *Gregg* from which the preceding quotation is taken in rejecting a contention in a capital case that it was improper for the State indirectly to appeal to the jurors to give the victim's family vengeance. *Colvin-el v. State,* 332 Md. 144, 175–76, 630 A.2d 725, 741 (1993). *See also Trimble v. State,* 300 Md. 387, 425, 478 A.2d 1143, 1162–63 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985) (quoting approvingly the same passage from *Gregg* in rejecting challenge on cruel and unusual punishment grounds to the imposition of a capital sentence).

The first italicized section, when placed into its proper context, cannot plausibly be read as advocating retribution beyond the level deemed appropriate in *Gregg.* The prosecutor specifically discussed the verdict sheet in both his initial closing argument and in his rebuttal summation, exhorting the jurors to "follow the form as it is before you." The State's argument, in its entirety, did not encourage the jury to deviate from the sentencing procedure required by Maryland statute and the Constitution.

In the second italicized quote, "No sentencing form, no instructions, no signature," Clermont discerns an appeal for the jurors to deny Clermont due process. Clermont's argument to us illustrates "oratorical conceit or flourish." *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707, 714 (1974). We, however, read the State's argument as properly directed to the lack of regard for human life shown by Clermont.

In the third italicized portion there was a defense objection to the State's argument that the court sustained, most probably because there was no evidence that Clermont

would be given an exercise room if he were sentenced to life without parole. Clermont's argument seems to be that the trial court, *sua sponte*, should have cut off the line of argument. We hold that the State was entitled to attempt to persuade the jury that death was the appropriate sentence as contrasted with life in prison, by referring to the food, shelter, clothing, and health care aspects of prison life.

 In any event, Clermont relies on plain error for relief with respect to each of the claimed improprieties in the State's argument. There is no basis for reversal because none of the alleged errors vitally affected Clermont's right to a fair and impartial trial. *Rubin v. State*, 325 Md. at 588, 602 A.2d at 694.

### X. Constitutional Arguments

For preservation purposes Clermont argues that the Maryland death penalty law is unconstitutional because (1) it requires the defendant to establish mitigating circumstances, (2) it requires defendants to establish that non-enumerated mitigating circumstances are, in fact, mitigating, and (3) it requires the State to prove that the aggravating circumstances outweigh the mitigating circumstances by only a preponderance of the evidence, rather than by a more reliable standard rising at least to the level of clear and convincing evidence. This Court has previously considered and rejected these contentions. *See Burch v. State*, 346 Md. 253, 299, 696 A.2d 443, 446 (1997); *Conyers*, 345 Md. at 576, 693 A.2d at 805–06; *Perry v. State*, 344 Md. 204, 247–48, 686 A.2d 274, 295 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997); *Whittlesey v. State*, 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Wiggins v. State*, 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991). *See also Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995).

### XI. Other Considerations

 In addition to considering the arguments advanced by Clermont on this appeal, we have also considered the imposi-

tion of the death sentence from the standpoint of the factors set forth in Article 27, § 414(e), and we make the following determinations:

1. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

2. The evidence supports the jury's findings of statutory aggravating circumstances under § 413(d); and

3. The evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances.

JUDGMENT AFFIRMED.

BELL, C.J., dissents and files opinion.

BELL, Chief Judge, dissenting.

The majority holds that the trial court did not err either in limiting the appellant's cross-examination of the State's principal witness or in requiring the appellant to allocute before the State's rebuttal closing argument. I respectfully dissent. Because I believe that the trial court's limitation of the appellant's cross-examination was in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, that to treat allocution, which is neither argument nor testimony, differently in a capital case than in a non-capital one, is impermissible, thus error, and that neither error is harmless, inasmuch as their effect, both separately and in combination, denied the appellant a fair trial, I would reverse the appellant's convictions and remand this case for a new trial.

## I

The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to be confronted with the witnesses against him. *See Merzbacher v. State,* 346 Md. 391, 411–12, 697 A.2d 432, 442 (1997); *Marshall v. State,* 346 Md. 186, 192, 695 A.2d 184, 187 (1997). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct.

1431, 1435, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974); *State v. Gray*, 344 Md. 417, 420, 687 A.2d 660, 662 (1997); *Ebb v. State*, 341 Md. 578, 587, 671 A.2d 974, 979 (1996). Encompassed in this right is a defendant's opportunity to test the State's case by cross-examining the State's witnesses on matters likely to affect their credibility, including bias, prejudice, or ulterior motive. *See Pointer v. Texas*, 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965); *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956, 956–59 (1968). "The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110, 39 L.Ed.2d at 354. *See also Smallwood v. State*, 320 Md. 300, 306, 577 A.2d 356, 359 (1990). Such information is necessary if jurors are to test properly the weight and credibility of a witness's testimony. *See California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970); *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409, 410–11 (1895).

Rawle White, an admitted participant in the crimes with which the appellant was charged and tried, testified for the State, as its principal witness. He did so in exchange for a reduced sentence—one that, in effect, amounted to thirty years—for his own murder conviction. On direct-examination, White identified the appellant as the principal in the first degree, *i.e.*, the one who pulled the trigger. On cross-examination, the appellant sought to discredit White by showing both his bias and "that [he] was motivated to implicate [the appellant] because he had been told by a detective (truly or falsely) that [the appellant] had implicated him." The latter attempt is reflected in the following colloquy (emphasis added):

"[DEFENSE COUNSEL] Q. You went down to the police station.

"[WHITE] A. Yes, sir.

"Q. In fact, what happened, Detective Rositch is the one who questioned you, is that correct?

"A. I guess. I can't remember his name, its been so long.

"Q. *And he said to you, I believe that [Clermont] is lying and trying to save himself, and [Bonner] is telling the truth.*

"*Is that what he said to you?*

"A. *No, sir.*

"Q. *He didn't say that to you?*

"A. *He came at me and said Alex Clermont claimed that I pulled the trigger that night.*

"Q. *And so you claim that Alex Clermont pulled the trigger that night.*

"[STATE'S ATTORNEY]: Objection. Move to strike.

"THE COURT: Sustained. Grant the motion to strike.

"Ladies and gentlemen of the jury, the last statement is stricken from the record, and is not to be used by you in your deliberations."

Reading the sentence—"*And so you claim that Alex Clermont pulled the trigger that night*"—as a declarative, rather than an interrogative, sentence, the majority upholds the trial court's limitation of the appellant's attempt to explore, on cross-examination, the witness's motivation. It reasons:

"Every aspect of the record ... indicates that the sentence spoken by defense counsel that is last quoted above was a declarative sentence, asserting something as a fact, and not an interrogative sentence, asking a question. Had the sentence been spoken with a rising tone, the court reporter should have ended the sentence with a question mark, but the reporter used a period. It is clear that the State's Attorney interpreted defense counsel's sentence as a statement asserting a fact. Not only did the State object, but it moved to strike, even though White had not given any answer to the question. The object of the motion to strike, which is usually accompanied by a request for an instruction to the jury to disregard certain evidence, is to remove

matters which have not been properly admitted as evidence from the jury's consideration.... In the instant matter defense counsel's statement of an asserted fact was not evidence and was properly the object of the motion to strike.

"The record also clearly reflects that the trial court had the same understanding of defense counsel's statement as did the court reporter and the State's Attorney. The court sustained the objection, granted the motion to strike, and, without the need for an express request from the State, instructed the jury to disregard 'the last statement.' "

348 Md. 419, 428–429, 704 A.2d 880, 884–885 (1998). More than that, however, the majority states that, "even if defense counsel used a rising tone to indicate a question, the trial court could, under the circumstances, consider that defense counsel was not really seeking an answer, but that defense counsel was simply indulging in a tactic to focus the jury on the legal issue that would be affected if the jury believed that White was lying." *Id.* at 431, 704 A.2d at 886. The majority concludes that, "if we treat the sentence in issue as a question, it is at best an argumentative one," that carries considerable baggage, requiring the State to object and thereby protect its witness on cross-examination. *Id.* at 431, 704 A.2d at 886. I disagree.

The majority relies on the fact that the court reporter ended the sentence with a period rather than a question mark. In so doing, it places undue emphasis on a court reporter's typographical notes and not enough on the context in which the sentence appears, which, in turn and by the way, has everything to do with the point the appellant sought to make and the manner in which he sought to make it. In other words, neither the interpretation given the sentence by the court reporter—how he or she chose to report it—nor any other court actor, including the court or the prosecutor, nor the punctuation that the court reporter may have used in connection with it is, and, indeed, should not be, dispositive.

Certainly, the appellant had every right to ask the State's principal witness whether he was testifying that the appellant pulled the trigger because he had been told that the appellant had accused him of being the trigger man. Whatever the witness's response, the accused is entitled to elicit it because the witness's demeanor as he answered the question bears on the witness's credibility; the jury's opportunity of seeing and assessing how the witness answers the question is extremely relevant. In fact, having the benefit of that opportunity may well be critical in that regard. Had the transcript shown, with regard to the sentence at issue, a question mark instead of a period, I wonder if the majority would be taking the position that it has taken in this case. A matter as important as this— a man's life is at stake—ought not depend on the interpretation that a court reporter may give a particular sentence or phrase. Context and purpose should prevail.[1] And when the meaning of a sentence, or whether the sentence is a question, is ambiguous, the benefit of the doubt, as is the case with the interpretation of ambiguous statutes, must be given to the accused.

Reading the sentence in question in the context of the appellant's cross-examination of White, the particular focus being on White's motivation for implicating the appellant, clearly shows that counsel was posing a leading question, not making a rhetorical or declarative statement. A leading question, one of the most effective tools of a cross-examiner, is "one that suggests to the witness the answer desired by the examiner." *McCormick on Evidence,* § 6 at 17 (4th Ed.1992).

---

1. I am aware that the majority seeks to justify its conclusion that the subject sentence is a declarative sentence by analyzing the appellant's cross-examination as a whole. I am not persuaded. Only a cursory review of the transcript reveals the fallacy of that assertion. Just prior to the disputed sentence, the appellant's counsel stated, "He didn't say that to you." The court reporter interpreted it as a question, as reflected by the question mark appended to it. Like the disputed sentence, however, it was not phrased as questions traditionally are. Similarly, "Like you did with the police," at another point in the cross-examination of White, was interpreted as a question. Again, the court reporter's interpretation ought not, as here, be dispositive.

"The question which contains a phase like, 'did he not?' is obviously and invariably leading, but almost any other type of question may be leading or not, depending upon the content and context. It is sometimes supposed that a question which can be answered yes or no is by that fact marked as leading."

*Id.* In this case, the question—*"And so you claim that Alex Clermont pulled the trigger that night"*—suggests the answer the appellant sought and it could be answered yes or no. *See Harward v. Harward,* 173 Md. 339, 350, 196 A. 318, 323 (1938); 3 Wigmore, *Evidence,* § 773 at 165 (Chadbourn rev. 1970) ("[I]t is well settled that on cross examination of an opponent's witness, ordinarily no question can be improper as leading.").

At trial, the court determines what evidence is material and relevant, and the extent to which a witness may be cross-examined for the purpose of showing bias or, in this case, more accurately, ulterior motive. *Ebb,* 341 Md. at 587, 671 A.2d at 978; *Bruce v. State,* 328 Md. 594, 624, 616 A.2d 392, 407 (1992), *cert denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Shields v. State,* 257 Md. 384, 392 263 A.2d 565, 569 (1970). "The trial judge retains discretion to impose reasonable limits on cross-examination to protect witness safety or to prevent harassment, prejudice, confusion of the issues, or inquiry that is repetitive or marginally relevant." *Marshall,* 346 Md. at 193, 695 A.2d at 187. That discretion, however, may not be exercised "until the constitutionally required threshold level of inquiry has been afforded the defendant." *Id.* A cross-examiner must be given wide latitude in attempting to establish a witness's bias or motivation to testify falsely. *Ebb,* 341 Md. at 587, 671 A.2d at 978; *Smallwood v. State,* 320 Md. 300, 307–08, 577 A.2d 356, 359 (1990). No such latitude was given the appellant in this case. Indeed, considering that White was the State's principal witness who fingered the appellant as the trigger person, I believe that the trial court's limitation of the cross-examination of White prevented the appellant from reaching his "constitutionally required threshold level of inquiry." This is evident by the trial

court's decision to not only sustain the State's objection, but also to strike the question from the record and not permit defense counsel to rephrase the question.

## II

The traditional timing of allocution [2] is as follows:

"The trial is over, the jury has reached a verdict and the accused is guilty of the crime with which he was charged. Now he stands at the bar of justice, a prisoner, and the judgment of the law is to be pronounced. But, before the court decrees the inexorable legal consequences which necessarily follow the finding of guilt, the court formally addresses the prisoner, informs him of the jury's verdict and directly puts the interrogatory, 'Do you know of any reason why judgment should not be pronounced upon you?' "

Paul W. Barrett, *Allocution*, 9 Mo. L.Rev. 115 (1944). In response to this invitation, defendants often express remorse, take responsibility for their crimes, or, as is more often the case, beg for forgiveness and present information in mitigation of sentence.

During the penalty phase of appellant's trial, the following exchange took place between defense counsel and the trial court:

"[DEFENSE COUNSEL]: Two issues, if I may Your Honor.

"The first issue is the issue of allocution. I think we both agree that the defendant has an absolute right to allocute, which is in addition to any argument made by counsel for the State or counsel for the defense.

---

**2.** Allocution, or allocutus, is defined in *Black's Law Dictionary* as follows:

"[The] [f]ormality of court's inquiry of defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on verdict of conviction; or, whether he would like to make [a] statement on his behalf and present any information in mitigation of sentence."

*Black's Law Dictionary*, at 76 (6th Ed.1990).

"It is my position and my request that after closing argument by counsel the defendant address the jury by allocution. I think historically in our jurisprudence system, before sentence is imposed the last person that the sentencing authority hears from is the defendant.

"In a normal proceeding the court would say to the defendant, do you have anything to say before sentencing is imposed?

"THE COURT: Do you have any authority other than what you have just given me as to how—the order for that in a death penalty proceeding?

"[DEFENSE COUNSEL]: There is no authority.

\* \* \* \*

"THE COURT: I will deny that request. I believe that since the State has the burden of proof in this trial that the State will have the last argument to the jury.

"[The appellant] has an absolute right to allocute, and that can either be after the State's first argument and before the defense argument, or after the defense argument and before the [S]tate[']s rebuttal argument, and I will review that tactical decision."

Thus, defense counsel requested that the trial court permit the appellant to allocute at the time customary in non-capital cases, just prior to the sentence being determined. Because, in capital cases, sentencing may be, and in this case was, done by a jury, that meant that the appellant be permitted to allocute after closing arguments. The trial court refused the request, however, ruling, and the majority agrees, that, because the State bears the ultimate burden of proof and is entitled to open and close arguments during a jury capital sentencing, the appellant is required to allocute to the jury before the State's rebuttal closing argument.

Agreeing with the trial court's ruling and rationale, the majority holds that "absent some compelling reason for a contrary result, the State has the last word before the jury in a capital sentencing," and that "any allocution by the capital

defendant almost universally must precede, at some point, the State's rebuttal closing argument." 348 Md. at 446, 704 A.2d at 893. This holding creates, unnecessarily and without good reason, a procedural difference in capital cases where the jury, rather than the court, is the sentencing authority. Moreover, it does not comport with fundamental fairness.

Maryland Rule 4–342(e) applies in non-capital cases. It provides:

"(e) *Allocution and Information in Mitigation.*—Before imposing sentence, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement and to present information in mitigation of punishment."

Maryland Rule 4–343(d), pertaining to capital cases, similarly provides:

"(d) *Allocution.*—Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement."

It is perhaps of some interest that in non-capital cases, allocution is coupled with "information in mitigation of punishment." This is perhaps because in capital cases, the rules provide for the production of mitigation evidence and that process is a more formal one than in non-capital cases. *See* Md. Rule 4–343(b); Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413.

Although the majority acknowledges that "[R]ule [4–343(d) ] does not specify when, '[b]efore sentence is determined,' the allocution may or must be made," 348 Md. at 446, 704 A.2d at 893, the majority interprets the Rule in such a way as to force defendants, in jury capital sentencing proceedings, to allocute prior to the State's rebuttal closing argument. In contrast, in non-jury capital sentencing proceedings, and in non-capital cases generally, that may not be the timing; the defendant may be permitted to decide whether to allocute before, during, or even after closing arguments, as is customarily done.

In 1982, when the Rules Committee of this Court considered the present rules governing allocution in non-capital and capital cases,[3] Md. Rules 4–342(e) and 4–343(d), respectively, there was discussion concerning defendants allocuting after final arguments, and in the case of jury capital sentencing, immediately before the jury retires. The Minutes of the October 15/16 1982 meeting of the Rules Committee provides, in pertinent part:

> "[Chairman of the Criminal Rules subcommittee] recommended that [Rule 4–703, the non-capital sentencing rule,] and Rule 4–704[, the capital sentencing rule,] should be revised so as not to make the right of allocution, set forth in section (d) of Rule 4–703, limited exclusively to non-capital cases. Judge McAuliffe concurred with this recommendation noting that there are hybrid cases where both capital and non-capital sentences are imposed. In such cases the defendant will want to allocute at least as to the non-capital sentence, especially in light of the fact that the capital sentence may be subsequently reversed on appeal. Judge McAuliffe further suggested that the defendant might want,

---

**3.** A note discussing this Court's decision in *Thanos v. State,* 330 Md. 77, 622 A.2d 727 (1993) chronicles the common law and statutory history of the right of allocution in Maryland, as follows:

> "The Court of Appeals first addressed the right of allocution in 1914. In *Dutton v. State,* the court endorsed the practice of providing the defendant with an opportunity to address the court in all cases in which the sentence of death or imprisonment could be imposed. In 1962, the judiciary adopted rule 761, which applied to both capital and noncapital cases and provided that 'before imposing sentence the court shall afford an accused or his counsel an opportunity to make a statement and to present information in mitigation of punishment.' Rule 761 was subsequently rescinded and replaced by rule 722, which like its predecessor, applied to both capital and noncapital cases.... In 1979, the Court of Appeals amended rule 772 to apply only to noncapital cases and adopted rule 772A for application in capital cases. Rule 772A did not address a defendant's right to allocution and remained the law in Maryland until the adoption of rule 4–343 in 1984. Rule 4–343(d) ... governs the right of allocution in Maryland courts today."

Daniel L Owel, *Clarifying Trial Court's Obligation to Conduct Sua Sponte Inquiries Into A Defendant's Competence to Stand Trial 'and Defendants' Right to Allocution,* 53 Md. L. Rev 793, 798 (1994)(footnotes omitted).

and should have the opportunity, to make a statement in favor of imposition of a sentence of life imprisonment as opposed to death."

\* \* \* \*

"[The Chief of the Criminal Division of the Attorney General's Office] asked whether the right of allocution, if permitted in capital cases, should be limited to being exercised before final arguments are made. The Chairman suggested that the timing of allocution ought to be left to judicial discretion. [The Criminal Division Chief] noted that she anticipates concern in the State's Attorney's office about unsworn statements being made by the defendant immediately prior to the jury's retiring to consider its verdict. "[The Chairman] proposed that section (d) of Rule 4–703 be amended to simply provide that the court shall afford the defendant the opportunity personally or through counsel to make a statement in mitigation of punishment. The simplified version of the section could then be added to Rule 4–704."

As we observed in *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986), "[t]he Rules Committee then voted to recommend to this Court that the rule applicable to noncapital cases be amended" and "make the amended allocution rule applicable to capital cases." 306 Md. at 197–98, 507 A.2d at 1111. In short, the Rules Committee addressed the concern of a defendant allocuting after the State's rebuttal closing argument, and it decided to treat allocution in jury and non-jury cases similarly, to wit, the decision of when a defendant chooses to allocute would not, as the majority now holds, be "subject to the constraints of a jury proceeding." Instead, all criminal defendants would be afforded the same benefits of allocution. This Court accepted the Rules Committee's recommendation to adopt a rule governing allocution in capital sentencing. That recommendation is now Rule 4–343(d).

The Court's decisions subsequent to the adoption of Rule 4–343(d) reveal the manner in which allocution has been treated

in Maryland. In *Harris v. State,* 306 Md. 344, 509 A.2d 120 (1986), for example, a trial court ruled that the defendant should not be permitted to allocute before the jury in addition to defense counsel's closing argument because "allocution was nothing more than a form of argument." We remanded for resentencing, holding that allocution was separate from and not synonymous to the term "argument," as the allocutory process, unlike closing arguments, provides the defendant with a unique opportunity to confront the sentencing authority. *Id.* at 358, 509 A.2d at 127("Section 413(c)(1)(i) states that any evidence relating to any mitigating circumstances is admissible at the capital sentencing proceeding. These statutory provisions reflect a strong public policy of providing the sentencing body in capital cases with the broadest possible range of relevant information that may counsel leniency."). *See also Thanos v. State,* 330 Md. 77, 90, 622 A.2d 727, 733 (1993)(defendant has ultimate decision whether and when to allocute); *Shifflett v. State,* 315 Md. 382, 388, 554 A.2d 814, 817 (1989)("The ability to speak in mitigation of punishment under the circumstances of this case necessarily entailed the opportunity to respond to the new substantive remarks of the prosecutor.").

Other than allocution, there is no other point at which the difference between the role of the court and the jury, as sentencing authorities in capital sentencing proceedings, is so pronounced. The majority's sole justification for this difference is stated as follows:

> "[I]n the jury capital sentencing context, should a conflict between the defendant and trial counsel emerge over when allocution will be made, the holding from *Thanos* that the decision is ordinarily that of the defendant will be transportable to the jury context. But, in that context, the court's discretion in establishing the defendant's range of options is additionally subject to the constraints of a jury proceeding. In a jury capital sentencing, the later any allocution is postponed in the proceeding, the greater is the opportunity for sandbagging and for confusing the jury."

348 Md. at 451–452, 704 A.2d at 896. The majority's concern with the jury being sandbagged and confused can be readily cured with an appropriate jury instruction explaining the nature and purpose of allocution.

The instant case is not a case where the capital defendant used allocution as an opportunity "to contest a disputed factual basis for the sentence," present new factual or legal arguments, and, in effect, make a surrebuttal to the State's closing rebuttal argument. To the contrary, in the instant case, the appellant used his allocution simply to plead for mercy:

> "First of all, I would like to apologize to the family and the loved ones, because I am sorry for the part that I took in this drama, and there is nothing that I can do to bring his life back, but I feel right now, I have taken responsibility for my part in taking Mr. McMullen's life, and I want to apologize to the family, and tell them that I am sorry, and I would like to ask the jurors for mercy."

This plea was appellant's last cry for mercy, pleading for the jury to impose a life sentence and spare his life. Allocution is one of the humanizing features of a death penalty proceeding and it is a right of the capital defendant that should not be abridged without good cause. *See* Caren Myers, *Encouraging Allocution at Capital Sentencing: A Proposal for Use Immunity*, 97 Columbia L.Rev. 787 (1997). Nor in my view ought it to be unduly burdened or diluted as to be largely meaningless. Treating allocution as what we have clearly said it is not, argument or evidence, and subjecting it to the strictures applicable to those forms of address to the jury has that effect and, for that reason, is fundamentally unfair.